## HUFFMAN ET AL. *v.* PURSUE, LTD.

No. 73–296.   Argued December 10, 1974—Decided March 18, 1975

*James J. Clancy* argued the cause for appellants. With him on the brief were *Lawrence S. Huffman pro se, Richard M. Bertsch,* and *Albert S. Johnston III.*

*Gilbert H. Deitch* argued the cause for appellee. With him on the brief was *Robert Eugene Smith*.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

This case requires that we decide whether our decision in *Younger* v. *Harris,* 401 U. S. 37 (1971), bars a federal district court from intervening in a state civil proceeding such as this, when the proceeding is based on a state statute believed by the district court to be unconstitutional. A similar issue was raised in *Gibson* v. *Berryhill,* 411 U. S. 564 (1973), but we were not required to decide it because there the enjoined state proceedings were before a biased administrative body which could not provide a necessary predicate for a *Younger* dismissal, that is, "the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved." *Id.,* at 577. Similarly, in *Speight* v. *Slaton,* 415 U. S. 333 (1974), we noted probable jurisdiction to consider the applicability of *Younger* to noncriminal cases, but remanded for reconsideration in light of a subsequent decision of the Georgia Supreme Court which struck down the challenged statute on similar facts. Today we do reach the issue, and conclude that in the circumstances presented here the principles of *Younger* are applicable even though the state proceeding is civil in nature.[1]

---

*Barbara Scott* and *James Bouras* filed a brief for the Motion Picture Association of America, Inc., as *amicus curiae* urging affirmance.

[1] Other recent cases raising issues of the applicability of *Younger* in the noncriminal context include *Mitchum* v. *Foster,* 407 U. S. 225 (1972), and *Sosna* v. *Iowa,* 419 U. S. 393 (1975). In *Mitchum,* a 42 U. S. C. § 1983 action to enjoin a pending nuisance proceeding was remanded for further proceedings; the District Court had denied relief solely on the basis of the anti-injunction statute, 28 U. S. C. § 2283, see n. 15, *infra.* Our opinion specified that we were in no

I

Appellants are the sheriff and prosecuting attorney of Allen County, Ohio. This case arises from their efforts to close the Cinema I Theatre, in Lima, Ohio. Under the management of both its current tenant, appellee Pursue, Ltd., and appellee's predecessor, William Dakota, the Cinema I has specialized in the display of films which may fairly be characterized as pornographic,[2] and which in numerous instances have been adjudged obscene after adversary hearings.

Appellants sought to invoke the Ohio public nuisance statute, Ohio Rev. Code Ann. § 3767.01 *et seq.* (1971), against appellee. Section 3767.01 (C)[3] provides that

way questioning or qualifying "the principles of equity, comity, and federalism" canvassed in *Younger.* 407 U. S., at 243.

In *Sosna* we directed the parties to address the *Younger* issue, 415 U. S. 911 (1974), reflecting our concern as to whether the constitutional merits should be reached in light of Sosna's failure to appeal the state trial court's adverse ruling through the state appellate network. Because both parties urged that we proceed to the merits, we did not reach the issue. *Sosna,* 419 U. S., at 396–397, n. 3.

[2] See *Miller* v. *California,* 413 U. S. 15, 18–19, n. 2 (1973), which discusses the distinction between "pornography" and "obscenity."

[3] "§ 3767.01 Definitions.

"As used in all sections of the Revised Code relating to nuisances:

. . . . .

"(C) 'Nuisance' means that which is defined and declared by statutes to be such and also means any place in or upon which lewdness, assignation, or prostitution is conducted, permitted, continued, or exists, or any place, in or upon which lewd, indecent, lascivious, or obscene films or plate negatives, film or plate positives, films designed to be projected on a screen for exhibition, films or glass slides either in negative or positive form designed for exhibition by projection on a screen, are photographed, manufactured, developed, screened, exhibited, or otherwise prepared or shown, and the personal property and contents used in conducting and maintaining any such place for any such purpose. This chapter shall not affect any news-

a place which exhibits obscene [4] films is a nuisance, while § 3767.06 [5] requires closure for up to a year of any place determined to be a nuisance. The statute also

paper, magazine, or other publication entered as second class matter by the post-office department."

[4] As interpreted by the Ohio Supreme Court, *State ex rel. Keating* v. *A Motion Picture Film Entitled "Vixen,"* 27 Ohio St. 2d 278, 272 N. E. 2d 137 (1971), the determination of obscenity is to be based on the definition contained in Ohio's criminal statutes, Ohio Rev. Code Ann. § 2905.34 (Supp. 1972), now § 2907.01 (1975). On this Court's remand of *Keating,* 413 U. S. 905 (1973), following our decision in *Miller* v. *California, supra,* the Ohio Supreme Court concluded that the statute's definition comported with *Miller*'s constitutional standards. 35 Ohio St. 2d 215, 301 N. E. 2d 880 (1973).

[5] "§ 3767.06 Content of judgment and order.

"If the existence of a nuisance is admitted or established in an action as provided in sections 3767.01 to 3767.11, inclusive, of the Revised Code, or in a criminal proceeding, an order of abatement shall be entered as a part of the judgment in the case, which order shall direct the removal from the place of all personal property and contents used in conducting the nuisance, and not already released under authority of the court as provided in section 3767.04 of the Revised Code, and shall direct the sale of such thereof as belong to the defendants notified or appearing, in the manner provided for the sale of chattels under execution. Such order shall also require the renewal for one year of any bond furnished by the owner of the real property, as provided in section 3767.04 of the Revised Code, or, if not so furnished shall continue for one year any closing order issued at the time of granting the temporary injunction, or, if no such closing order was then issued, shall include an order directing the effectual closing of the place against its use for any purpose, and keeping it closed for a period of one year unless sooner released. The owner of any place closed and not released under bond may then appear and obtain such release in the manner and upon fulfilling the requirements provided in section 3767.04 of the Revised Code. The release of the property under this section shall not release it from any judgment, lien, penalty, or liability to which it may be subject. Owners of unsold personal property and contents so seized must appear and claim the same within ten days after such order of abatement is made and prove innocence, to the satisfaction of the

provides for preliminary injunctions pending final determination of status as a nuisance,[6] for sale of all personal property used in conducting the nuisance,[7] and for release from a closure order upon satisfaction of certain conditions (including a showing that the nuisance will not be re-established).[8]

court, of any knowledge of said use thereof and that with reasonable care and diligence they could not have known thereof. Every defendant in the action is presumed to have had knowledge of the general reputation of the place. If such innocence is established, such unsold personal property and contents shall be delivered to the owner, otherwise it shall be sold as provided in this section. For removing and selling the personal property and contents, the officer shall be entitled to charge and receive the same fees as he would for levying upon and selling like property on execution; and for closing the place and keeping it closed, a reasonable sum shall be allowed by the court."

[6] Ohio Rev. Code Ann. § 3767.04 (1971).

[7] § 3767.06 (1971), *supra*, n. 5.

[8] *Ibid.* The referenced portion of § 3767.04 (1971) provides:

"The owner of any real or personal property closed or restrained or to be closed or restrained may appear between the filing of the petition and the hearing on the application for a permanent injunction and, upon payment of all costs incurred and upon the filing of a bond by the owner of the real property with sureties to be approved by the clerk in the full value of the property to be ascertained by the court, or, in vacation, by the judge, conditioned that such owner will immediately abate the nuisance and prevent the same from being established or kept until the decision of the court or judge is rendered on the application for a permanent injunction, then the court, or judge in vacation, if satisfied of the good faith of the owner of the real property and of innocence on the part of any owner of the personal property of any knowledge of the use of such personal property as a nuisance and that, with reasonable care and diligence, such owner could not have known thereof, shall deliver such real or personal property, or both, to the respective owners thereof, and discharge or refrain from issuing at the time of the hearing on the application for the temporary injunction any order closing such real property or restraining the removal or interference with such per-

Appellants instituted a nuisance proceeding in the Court of Common Pleas of Allen County against appellee's predecessor, William Dakota. During the course of the somewhat involved legal proceedings which followed, the Court of Common Pleas reviewed 16 movies which had been shown at the theater. The court rendered a judgment that Dakota had engaged in a course of conduct of displaying obscene movies at the Cinema I, and that the theater was therefore to be closed, pursuant to Ohio Rev. Code Ann. § 3767.06 (1971), "for any purpose for a period of one year unless sooner released by Order of [the] Court pursuant to defendant-owners fulfilling the requirements provided in Section 3767.04 of the Revised Code of Ohio." The judgment also provided for the seizure and sale of personal property used in the theater's operations.[9]

Appellee, Pursue, Ltd., had succeeded to William Dakota's leasehold interest in the Cinema I prior to entry of the state-court judgment. Rather than appealing that judgment within the Ohio court system, it immediately filed suit in the United States District Court for the Northern District of Ohio. The complaint was based on 42 U. S. C. § 1983 and alleged that appellants' use of Ohio's nuisance statute constituted a deprivation of constitutional rights under the color of state law. It sought injunctive relief and a declaratory judgment that the statute was unconstitutional and unenforceable.[10] Since

---

sonal property. The release of any real or personal property, under this section, shall not release it from any judgment, lien, penalty, or liability to which it may be subjected."

[9] State ex rel. Huffman v. Dakota, No. 72 CIV 0326 (Ct. Com. Pleas, Allen County, Ohio, Nov. 30, 1972).

[10] Because the state-court judgment was primarily directed against a property interest to which Pursue had succeeded, the District Court concluded that Pursue had standing to challenge the nuisance statute. Similarly, counsel for Pursue conceded at oral argument that Pursue

the complaint was directed against the constitutionality of a state statute, a three-judge court was convened.[11] The District Court concluded that while the statute was not vague, it did constitute an overly broad prior restraint on First Amendment rights insofar as it permanently or temporarily prevented the showing of films which had not been adjudged obscene in prior adversary hearings. Cf. *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931). Fashioning its remedy to match the perceived constitutional defect, the court permanently enjoined the execution of that portion of the state court's judgment that closed the Cinema I to films which had not been adjudged obscene.[12] The judgment and opinion of the District Court give no indication that it considered whether it should have stayed its hand in deference to the principles of federalism which find expression in *Younger* v. *Harris,* 401 U. S. 37 (1971).

On this appeal, appellants raise the *Younger* problem, as well as a variety of constitutional and statutory issues. We need consider only the applicability of *Younger.*

## II

*Younger* and its companion cases [13] considered the propriety of federal-court intervention in pending state

could have appealed the judgment of the Court of Common Pleas within the Ohio court system.

[11] Pending the convening of the three-judge court, a single judge of the Northern District of Ohio stayed the judgment of the Court of Common Pleas, except insofar as that judgment applied to films which had been declared obscene in a prior adversary hearing. The stay order was entered on the day that the action was filed, one day after entry of judgment by the Court of Common Pleas.

[12] No. C 72–432 (ND Ohio, Apr. 20, 1973).

[13] *Samuels* v. *Mackell,* 401 U. S. 66 (1971); *Boyle* v. *Landry,* 401 U. S. 77 (1971); *Perez* v. *Ledesma,* 401 U. S. 82 (1971); *Dyson* v. *Stein,* 401 U. S. 200 (1971); *Byrne* v. *Karalexis,* 401 U. S. 216 (1971).

criminal prosecutions. The issue was not a novel one, and the Court relied heavily on *Fenner* v. *Boykin,* 271 U. S. 240 (1926), and subsequent cases [14] which endorsed its holding that federal injunctions against the state criminal law enforcement process could be issued only "under extraordinary circumstances where the danger of irreparable loss is both great and immediate." *Id.,* at 243. *Younger* itself involved a challenge to a prosecution under the California Criminal Syndicalism Act, which allegedly was unconstitutional on its face. In an opinion for the Court by Mr. Justice Black, we observed that "it has been perfectly natural for our cases to repeat time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." 401 U. S., at 45. We noted that not only had a congressional statute manifested an interest in permitting state courts to try state cases,[15] but that there had also long existed a strong judicial policy against federal interference with state criminal proceedings. We recognized that this judicial policy is based in part on the traditional doctrine that a court of equity should stay its hand when a movant

---

[14] See, *e. g., Spielman Motor Sales Co.* v. *Dodge,* 295 U. S. 89 (1935); *Beal* v. *Missouri P. R. Co.,* 312 U. S. 45 (1941); *Watson* v. *Buck,* 313 U. S. 387 (1941); *Williams* v. *Miller,* 317 U. S. 599 (1942); *Douglas* v. *City of Jeannette,* 319 U. S. 157 (1943).

[15] Title 28 U. S. C. § 2283 provides: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." We held in *Mitchum* v. *Foster,* 407 U. S. 225 (1972), that 42 U. S. C. § 1983 contained an expressly authorized congressional exception. Thus, while the statute does express the general congressional attitude which was recognized in *Younger,* it does not control the case before us today.

has an adequate remedy at law, and that it "particularly should not act to restrain a criminal prosecution." *Id.*, at 43. But we went on to explain that this doctrine "is reinforced by an even more vital consideration," an aspect of federalism which we described as

> "the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.*, at 44.

Central to *Younger* was the recognition that ours is a system in which

> "the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Ibid.*

We reaffirmed the requirement of *Fenner* v. *Boykin* that extraordinary circumstances must be present to justify federal injunctive relief against state criminal prosecutions. Echoing *Fenner,* we stated that a movant must show not merely the "irreparable injury" which is a normal prerequisite for an injunction, but also must show that the injury would be " 'great and immediate.' " 401 U. S., at 46. The opinion also suggested that only in extraordinary situations could the necessary injury be shown if the prosecution was conducted in good faith and without an intent to harass. *Id.*, at 54. It was particularly noted that the "cost, anxiety, and inconvenience of having to defend against

a single criminal prosecution" was not the type of injury that could justify federal interference. *Id., at* 46.[16]

In *Younger* we also considered whether the policy of noninterference had been modified by our decision in *Dombrowski* v. *Pfister,* 380 U. S. 479 (1965), at least insofar as First Amendment attacks on statutes thought to be facially invalid are concerned. We observed that the arrests and threatened prosecutions in *Dombrowski* were alleged to have been in bad faith and employed as a means of harassing the federal-court plaintiffs. That case was thus within the traditional narrow exceptions to the doctrine that federal courts should not interfere with state prosecutions. We acknowledged in *Younger* that it is " 'of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it,' " and that such a situation might justify federal intervention, 401 U. S., at 53–54. But we unequivocally held that facial invalidity of a statute is not itself an exceptional circumstance justifying federal interference with state criminal proceedings.

In *Steffel* v. *Thompson,* 415 U. S. 452 (1974), we considered whether *Younger* required exceptional circumstances to justify federal declaratory relief against state criminal statutes when a prosecution was not pending. In concluding that it did not, we had occasion to identify more specifically some of the means by which federal interference with state proceedings might violate the principles of comity and federalism on which *Younger* is based. We noted that "the relevant principles of equity,

---

[16] While these standards governing federal interference were largely shaped in the context of prayers for federal injunctions against state proceedings, it is clear that with respect to pending prosecutions the same standards apply to interference in the form of declaratory relief. See *Samuels* v. *Mackell,* 401 U. S. 66 (1971).

comity, and federalism 'have little force in the absence of a pending state proceeding.' " *Id.,* at 462. We explained:

> "When no state criminal proceeding is pending at the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles." *Ibid.*

It is against this background that we consider the propriety of federal-court intervention with the Ohio nuisance proceeding at issue in this case.

## III

The seriousness of federal judicial interference with state civil functions has long been recognized by this Court. We have consistently required that when federal courts are confronted with requests for such relief, they should abide by standards of restraint that go well beyond those of private equity jurisprudence. For example, *Massachusetts State Grange* v. *Benton,* 272 U. S. 525 (1926), involved an effort to enjoin the operation of a state daylight savings act. Writing for the Court, Mr. Justice Holmes cited *Fenner* v. *Boykin, supra,* and emphasized a rule that "should be very strictly observed," 272 U. S., at 529, "that no injunction ought to issue against officers of a State clothed with authority to enforce the law in question, unless in a case reasonably free from doubt and when necessary to prevent great and irreparable injury." *Id.,* at 527.

Although Mr. Justice Holmes was confronted with a bill seeking an injunction against state executive officers, rather than against state judicial proceedings,

we think that the relevant considerations of federalism are of no less weight in the latter setting. If anything, they counsel more heavily toward federal restraint, since interference with a state judicial proceeding prevents the state not only from effectuating its substantive policies, but also from continuing to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies. Such interference also results in duplicative legal proceedings, and can readily be interpreted "as reflecting negatively upon the state court's ability to enforce constitutional principles." Cf. *Steffel* v. *Thompson, supra*, at 462.

The component of *Younger* which rests upon the threat to our federal system is thus applicable to a civil proceeding such as this quite as much as it is to a criminal proceeding. *Younger*, however, also rests upon the traditional reluctance of courts of equity, even within a unitary system, to interfere with a criminal prosecution. Strictly speaking, this element of *Younger* is not available to mandate federal restraint in civil cases. But whatever may be the weight attached to this factor in civil litigation involving private parties, we deal here with a state proceeding which in important respects is more akin to a criminal prosecution than are most civil cases. The State is a party to the Court of Common Pleas proceeding, and the proceeding is both in aid of and closely related to criminal statutes which prohibit the dissemination of obscene materials. Thus, an offense to the State's interest in the nuisance litigation is likely to be every bit as great as it would be were this a criminal proceeding. Cf. *Younger* v. *Harris,* 401 U. S., at 55 n. 2 (STEWART, J., concurring). Similarly, while in this case the District Court's injunction has not directly disrupted Ohio's criminal justice

system, it has disrupted that State's efforts to protect the very interests which underlie its criminal laws and to obtain compliance with precisely the standards which are embodied in its criminal laws.[17]

## IV

In spite of the critical similarities between a criminal prosecution and Ohio nuisance proceedings, appellee nonetheless urges that there is also a critical difference between the two which should cause us to limit *Younger* to criminal proceedings. This difference, says appellee, is that whereas a state-court criminal defendant may, after exhaustion of his state remedies, present his constitutional claims to the federal courts through habeas corpus, no analogous remedy is available to one, like appellee, whose constitutional rights may have been infringed in a state proceeding which cannot result in custodial detention or other criminal sanction.

A civil litigant may, of course, seek review in this Court of any federal claim properly asserted in and rejected by state courts. Moreover, where a final decision of a state court has sustained the validity of a state statute challenged on federal constitutional grounds, an appeal to this Court lies as a matter of right. 28 U. S. C. § 1257 (2). Thus, appellee in this case was assured of eventual consideration of its claim by this Court. But quite apart from appellee's right to appeal had it remained in state court, we conclude that it should not be permitted the luxury of federal litigation of issues presented by ongoing state proceedings, a luxury which,

---

[17] The relation of a proceeding which is nominally "civil" to a State's criminal laws has been relied on by lower federal courts in resolving *Younger* problems. See *MTM, Inc.* v. *Baxley,* 365 F. Supp. 1182 (ND Ala. 1973), probable jurisdiction noted, 415 U. S. 975 (1974); *Palaio* v. *McAuliffe,* 466 F. 2d 1230 (CA5 1972).

as we have already explained, is quite costly in terms of the interests which *Younger* seeks to protect.

Appellee's argument, that because there may be no civil counterpart to federal habeas it should have contemporaneous access to a federal forum for its federal claim, apparently depends on the unarticulated major premise that every litigant who asserts a federal claim is entitled to have it decided on the merits by a federal, rather than a state, court. We need not consider the validity of this premise in order to reject the result which appellee seeks. Even assuming, *arguendo*, that litigants are entitled to a federal forum for the resolution of all federal issues, that entitlement is most appropriately asserted by a state litigant when he seeks to *relitigate* a federal issue adversely determined in *completed* state court proceedings.[18] We do not understand why the federal forum must be available prior to completion of the state proceedings in which the federal issue arises, and the considerations canvassed in *Younger* militate against such a result.

The issue of whether federal courts should be able to interfere with ongoing state proceedings is quite distinct and separate from the issue of whether litigants are entitled to subsequent federal review of state-court dispositions of federal questions. *Younger* turned on considerations of comity and federalism peculiar to the fact that state proceedings were pending; it did *not* turn on the fact that in any event a criminal defendant

---

[18] We in no way intend to suggest that there is a right of access to a federal forum for the disposition of all federal issues, or that the normal rules of res judicata and judicial estoppel do not operate to bar relitigation in actions under 42 U. S. C. § 1983 of federal issues arising in state court proceedings. Cf. *Preiser* v. *Rodriguez,* 411 U. S. 475, 497 (1973). Our assumption is made solely as a means of disposing of appellee's contentions without confronting issues which have not been briefed or argued in this case.

could eventually have obtained federal habeas consideration of his federal claims. The propriety of federal-court interference with an Ohio nuisance proceeding must likewise be controlled by application of those same considerations of comity and federalism.

Informed by the relevant principles of comity and federalism, at least three Courts of Appeals have applied *Younger* when the pending state proceedings were civil in nature. See *Duke* v. *Texas*, 477 F. 2d 244 (CA5 1973); *Lynch* v. *Snepp*, 472 F. 2d 769 (CA4 1973); *Cousins* v. *Wigoda*, 463 F. 2d 603 (CA7 1972). For the purposes of the case before us, however, we need make no general pronouncements upon the applicability of *Younger* to all civil litigation. It suffices to say that for the reasons heretofore set out, we conclude that the District Court should have applied the tests laid down in *Younger* in determining whether to proceed to the merits of appellee's prayer for relief against this Ohio civil nuisance proceeding.

## V

Appellee contends that even if *Younger* is applicable to civil proceedings of this sort, it nonetheless does not govern this case because at the time the District Court acted there was no longer a "pending state court proceeding" as that term is used in *Younger*. *Younger* and subsequent cases such as *Steffel* have used the term "pending proceeding" to distinguish state proceedings which have already commenced from those which are merely incipient or threatened. Here, of course, the state proceeding had begun long before appellee sought intervention by the District Court. But appellee's point, we take it, is not that the state proceeding had not begun, but that it had ended by the time its District Court complaint was filed.[19]

---

[19] It would ordinarily be difficult to consider this problem, that of the duration of *Younger's* restrictions after entry of a state trial

Appellee apparently relies on the facts that the Allen County Court of Common Pleas had already issued its judgment and permanent injunction when this action was filed, and that no appeal from that judgment has ever been taken to Ohio's appellate courts. As a matter of state procedure, the judgment presumably became final, in the sense of being nonappealable, at some point after the District Court filing, possibly prior to entry of the District Court's own judgment, but surely after the single judge stayed the state court's judgment. We need not, however, engage in such inquiry. For regardless of when the Court of Common Pleas' judgment became final, we believe that a necessary concomitant of *Younger* is that a party in appellee's posture must exhaust his state appellate remedies before seeking relief in the District Court, unless he can bring himself within one of the exceptions specified in *Younger*.

Virtually all of the evils at which *Younger* is directed would inhere in federal intervention prior to completion of state appellate proceedings, just as surely as they would if such intervention occurred at or before trial. Intervention at the later stage is if anything more highly duplicative, since an entire trial has already taken place, and it is also a direct aspersion on the capabilities and good faith of state appellate courts. Nor, in these state-initiated nuisance proceedings, is federal intervention at the appellate stage any the less a disruption of the State's efforts to protect interests which it deems important. Indeed, it is likely to be even more disruptive and offensive because the State has already won a *nisi*

---

court judgment, without also considering the res judicata implications of such a judgment. However, appellants did not plead res judicata in the District Court, and it is therefore not available to them here. See Fed. Rule Civ. Proc. 8 (c); *Sosna* v. *Iowa,* 419 U. S., at 396–397, n. 3.

*prius* determination that its valid policies are being violated in a fashion which justifies judicial abatement.

Federal post-trial intervention, in a fashion designed to annul the results of a state trial, also deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction.[20] We think this consideration to be of some importance because it is typically a judicial system's appellate courts which are by their nature a litigant's most appropriate forum for the resolution of constitutional contentions. Especially is this true when, as here, the constitutional issue involves a statute which is capable of judicial narrowing. In short, we do not believe that a State's judicial system would be fairly accorded the opportunity to resolve federal issues arising in its courts if a federal district court were permitted to substitute itself for the State's appellate courts. We therefore hold that *Younger* standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies.[21]

---

[20] That a state judicial system may retain undisturbed jurisdiction despite possibly erroneous trial court disposition of constitutional issues was recognized in *Dombrowski* v. *Pfister*, 380 U. S. 479, 484–485 (1965), where we stated: "[T]he mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings."

[21] By requiring exhaustion of state appellate remedies for the purposes of applying *Younger*, we in no way undermine *Monroe* v. *Pape*, 365 U. S. 167 (1961). There we held that one seeking redress under 42 U. S. C. § 1983 for a deprivation of federal rights need not first initiate state proceedings based on related state causes of action. 365 U. S., at 183. *Monroe* v. *Pape* had nothing to do with the problem presently before us, that of the deference to be accorded

At the time appellee filed its action in the United States District Court, it had available the remedy of appeal to the Ohio appellate courts. Appellee nonetheless contends that exhaustion of state appellate remedies should not be required because an appeal would have been "futile." This claim is based on the decision of the Supreme Court of Ohio in *State ex rel. Keating* v. *A Motion Picture Film Entitled "Vixen,"* 27 Ohio St. 2d 278, 272 N. E. 2d 137 (1971), which had been rendered at the time of the proceedings in the Court of Common Pleas. While *Keating* did uphold the use of a nuisance statute against a film which ran afoul of Ohio's statutory definition of obscenity, it had absolutely nothing to say with respect to appellee's principal contention here, that of whether the First and Fourteenth Amendments prohibit a blanket injunction against a showing of all films, including those which have not been adjudged obscene in adversary proceedings. We therefore have difficulty understanding appellee's belief that an appeal was doomed to failure.

More importantly, we are of the opinion that the considerations of comity and federalism which underlie *Younger* permit no truncation of the exhaustion requirement merely because the losing party in the state court of general jurisdiction believes that his chances of success on appeal are not auspicious. Appellee obviously be-

state proceedings which have already been initiated and which afford a competent tribunal for the resolution of federal issues.

Our exhaustion requirement is likewise not inconsistent with such cases as *City Bank Farmers Trust Co.* v. *Schnader,* 291 U. S. 24 (1934), and *Bacon* v. *Rutland R. Co.,* 232 U. S. 134 (1914), which expressed the doctrine that a federal equity plaintiff challenging state administrative action need not have exhausted his state judicial remedies. Those cases did not deal with situations in which the state judicial process had been initiated.

lieves itself possessed of a viable federal claim, else it would not so assiduously seek to litigate in the District Court. Yet, Art. VI of the United States Constitution declares that "the Judges in every State shall be bound" by the Federal Constitution, laws, and treaties. Appellee is in truth urging us to base a rule on the assumption that state judges will not be faithful to their constitutional responsibilities. This we refuse to do. The District Court should not have entertained this action, seeking preappeal interference with a state judicial proceeding, unless appellee established that early intervention was justified under one of the exceptions recognized in *Younger*.[22]

## VI

*Younger*, and its civil counterpart which we apply today, do of course allow intervention in those cases where the District Court properly finds that the state proceeding is motivated by a desire to harass or is conducted in bad faith, or where the challenged statute is " 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' " As we have noted, the District Court in this case did not rule on the *Younger* issue, and thus apparently has not considered whether its intervention was justified by one of these narrow exceptions. Even if the District Court's opinion can be interpreted as a *sub silentio* determina-

---

[22] While appellee had the option to appeal in state courts at the time it filed this action, we do not know for certain whether such remedy remained available at the time the District Court issued its permanent injunction, or whether it remains available now. In any event, appellee may not avoid the standards of *Younger* by simply failing to comply with the procedures of perfecting its appeal within the Ohio judicial system.

tion that the case fits within the exception for statutes which are " 'flagrantly and patently violative of express constitutional prohibitions,' " such a characterization of the statute is not possible after the subsequent decision of the Supreme Court of Ohio in *State ex rel. Ewing* v. *A Motion Picture Film Entitled "Without a Stitch,"* 37 Ohio St. 2d 95, 307 N. E. 2d 911 (1974). That case narrowly construed the Ohio nuisance statute, with a view to avoiding the constitutional difficulties which concerned the District Court.[23]

We therefore think that this case is appropriate for remand so that the District Court may consider whether irreparable injury can be shown in light of *"Without a Stitch,"* and if so, whether that injury is of such a nature that the District Court may assume jurisdiction under an exception to the policy against federal judicial interference with state court proceedings of this kind. The judgment of the District Court is vacated and the cause is

---

[23] In *"Without a Stitch"* it was decided that the closure provisions of Ohio Rev. Code Ann. § 3767.06 (1971) were applicable even if a theater had shown only one film which was adjudged to be obscene. However, the Ohio Supreme Court was concerned with the constitutional implications of prior restraint of films which had not been so adjudged. In narrowing the statute the court noted that § 3767.04 specifies conditions under which a release may be obtained from the closure order: the property owner must appear in court, pay the cost incurred in the action, file a bond in the full value of the property, and demonstrate to the court that he will prevent the nuisance from being re-established. The court then made this critical clarification: "The nuisance is the exhibition of the particular film declared obscene. The release provisions do not, as appellants contend, require the owner to show that no film to be exhibited during the one-year period will be obscene. Such a requirement would not only be impossible, as a practical matter, but also would be an unconstitutional prior restraint . . . ." 37 Ohio St. 2d, at 105, 307 N. E. 2d, at 918.

remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUG-LAS and MR. JUSTICE MARSHALL join, dissenting.

I dissent. The treatment of the state *civil* proceeding as one "in aid of and closely related to criminal statutes" is obviously only the first step toward extending to state *civil* proceedings generally the holding of *Younger* v. *Harris,* 401 U. S. 37 (1971), that federal courts should not interfere with pending state *criminal* proceedings except under extraordinary circumstances.[1] Similarly, today's holding that the plaintiff in an action under 42 U. S. C. § 1983 may not maintain it without first exhausting state appellate procedures for review of an adverse state trial court decision is but an obvious first step toward discard of heretofore settled law that such actions may be maintained without first exhausting state judicial remedies.

*Younger* v. *Harris* was basically an application, in the context of the relation of federal courts to pending state criminal prosecutions, of "the basic doctrine of equity jurisprudence that courts of equity . . . particularly should not act to restrain a criminal prosecution." 401 U. S., at 43. "The maxim that equity will not enjoin a criminal prosecution summarizes centuries of weighty experience in Anglo-American law." *Stefanelli* v. *Minard,* 342 U. S. 117, 120 (1951). But *Younger* v. *Harris* was

---

[1] The Court reaches the *Younger* issue although appellants did not plead *Younger* in the District Court. Yet the Court implies that *Younger* is not a jurisdictional matter, since we allowed the parties to waive it in *Sosna* v. *Iowa,* 419 U. S. 393 (1975). *Ante,* at 595 n. 1. In that circumstance, I address the *Younger* issue solely to respond to the Court's treatment of it.

also a decision enforcing "the national policy forbidding federal courts to stay or enjoin pending state court [criminal] proceedings except under special circumstances." 401 U. S., at 41. See also *id.,* at 44. For in decisions long antedating *Younger* v. *Harris,* the Court had invested the basic maxim with particular significance as a restraint upon federal equitable interference with pending state prosecutions. Not a showing of irreparable injury alone but of irreparable injury "both great and immediate" is required to justify federal injunctive relief against a pending state prosecution. *Fenner* v. *Boykin,* 271 U. S. 240, 243 (1926); *Spielman Motor Sales Co.* v. *Dodge,* 295 U. S. 89, 95 (1935). Injury merely "incidental to every criminal proceeding brought lawfully and in good faith" is not irreparable injury that justifies an injunction. *Douglas* v. *City of Jeannette,* 319 U. S. 157, 164 (1943). See also *Dombrowski* v. *Pfister,* 380 U. S. 479, 485 (1965). The line of decisions culminating in *Younger* v. *Harris* reflects this Court's longstanding recognition that equitable interference by federal courts with pending state prosecutions is incompatible in our federal system with the paramount role of the States in the definition of crimes and the enforcement of criminal laws. Federal-court noninterference with state prosecution of crimes protects against "the most sensitive source of friction between States and Nation." *Stefanelli* v. *Minard, supra,* at 120.

The tradition, however, has been quite the opposite as respects federal injunctive interference with pending state civil proceedings. Even though legislation as far back as 1793 has provided in "seemingly uncompromising language," *Mitchum* v. *Foster,* 407 U. S. 225, 233 (1972), that a federal court "may not grant an injunction to stay proceedings in a State court" with specified exceptions, see 28 U. S. C. § 2283, the Court has consistently en-

grafted exceptions upon the prohibition. Many, if not most, of those exceptions have been engrafted under the euphemism "implied." The story appears in *Mitchum* v. *Foster, supra,* at 233–236. Indeed, when Congress became concerned that the Court's 1941 decision in *Toucey* v. *New York Life Ins. Co.,* 314 U. S. 118, forecast the possibility that the 1793 Act might be enforced according to its literal terms, Congress amended the Act in 1948 "to restore 'the basic law as generally understood and interpreted prior to the Toucey decision.'" *Mitchum* v. *Foster, supra,* at 236.

Thus today's extension of *Younger* v. *Harris* turns the clock back and portends once again the resuscitation of the literal command of the 1793 Anti-Injunction Act— that the state courts should be free from interference by federal injunction even in civil cases. This not only would overrule some 18 decades of this Court's jurisprudence but would heedlessly flout Congress' evident purpose in enacting the 1948 amendment to acquiesce in that jurisprudence.

The extension also threatens serious prejudice to the potential federal-court plaintiff not present when the pending state proceeding is a criminal prosecution. That prosecution does not come into existence until completion of steps designed to safeguard him against spurious prosecution—arrest, charge, information, or indictment. In contrast, the civil proceeding, as in this case, comes into existence merely upon the filing of a complaint, whether or not well founded. To deny by fiat of this Court the potential federal plaintiff a federal forum in that circumstance is obviously to arm his adversary (here the public authorities) with an easily wielded weapon to strip him of a forum and a remedy that federal statutes were enacted to assure him. The Court does not escape this consequence by characterizing the state civil proceeding in-

volved here as "in aid of and closely related to criminal statutes." The nuisance action was brought into being by the mere filing of the complaint in state court, and the untoward consequences for the federal plaintiff were thereby set in train without regard to the connection, if any, of the proceeding to the State's criminal laws.

Even if the extension of *Younger* v. *Harris* to pending state civil proceedings can be appropriate in any case, and I do not think it can be,[2] it is plainly improper in the case of an action by a federal plaintiff, as in this case, grounded upon 42 U. S. C. § 1983.[3] That statute serves a particular congressional objective long recognized and enforced by the Court. Today's extension will defeat that objective. After the War Between the States, "nationalism dominated political thought and brought with it congressional investiture of the federal judiciary with enormously increased powers." *Zwickler* v. *Koota,*

---

[2] Abstention where authoritative resolution by state courts of ambiguities in a state statute is sufficiently likely to avoid or significantly modify federal questions raised by the statute is another matter. Abstention is justified in such cases primarily by the policy of avoidance of premature constitutional adjudication. The federal plaintiff is therefore not dismissed from federal court as he is in *Younger* cases. On the contrary, he may reserve his federal questions for decision by the federal district court and not submit them to the state courts. *England* v. *Louisiana State Board of Medical Examiners,* 375 U. S. 411 (1964). Accordingly, retention by the federal court of jurisdiction of the federal complaint pending state-court decision, not dismissal of the complaint, is the correct practice. *Lake Carriers' Assn.* v. *MacMullan,* 406 U. S. 498, 512–513 (1972).

[3] Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

389 U. S. 241, 246 (1967). Section 1983 was enacted at that time as § 1 of the Civil Rights Act of 1871, 17 Stat. 13. 389 U. S., at 247. That Act, and the Judiciary Act of 1875, which granted the federal courts general federal-question jurisdiction, completely altered Congress' pre-Civil War policy of relying on state courts to vindicate rights arising under the Constitution and federal laws. 389 U. S., at 245–246. These statutes constituted the lower federal courts " 'the *primary* and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States.' " *Steffel* v. *Thompson,* 415 U. S. 452, 464 (1974). The fact, standing alone, that state courts also must protect federal rights can never justify a refusal of federal courts to exercise that jurisdiction. *Zwickler* v. *Koota, supra,* at 248. This is true notwithstanding the possibility of review by this Court of state decisions for, "even when available by appeal rather than only by discretionary writ of certiorari, [that possibility] is an inadequate substitute for the initial District Court determination . . . to which the litigant is entitled in the federal courts." *England* v. *Louisiana State Board of Medical Examiners,* 375 U. S. 411, 416 (1964).

Consistently with this congressional objective of the 1871 and 1875 Acts we held in *Monroe* v. *Pape,* 365 U. S. 167, 183 (1961), that a federal plaintiff suing under § 1983 need not exhaust state administrative or judicial remedies before filing his action under § 1983 in federal district court. "The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Ibid.* The extension today of *Younger* v. *Harris* to require exhaustion in an action under § 1983 drastically undercuts *Monroe* v. *Pape* and its numerous progeny—the mere filing of a complaint against a potential § 1983 litigant forces him to exhaust state remedies.

*Mitchum* v. *Foster, supra,* holding that actions under § 1983 are excepted from the operation of the federal anti-injunction statute, 28 U. S. C. § 2283, is also undercut by today's extension of *Younger*. *Mitchum* canvassed the history of § 1983 and concluded that it extended "federal power in an attempt to remedy the state courts' failure to secure federal rights." 407 U. S., at 241. *Mitchum* prompted the comment that if *Younger* v. *Harris* were extended to civil cases, "much of the rigidity of section 2283 would be reintroduced, the significance of *Mitchum* for those seeking relief from state civil proceedings would largely be destroyed, and the recognition of section 1983 as an exception to the Anti-Injunction Statute would have been a Pyrrhic victory." [4] Today's decision fulfills that gloomy prophecy. I therefore dissent from the remand and would reach the merits.

MR. JUSTICE DOUGLAS, while joining in the opinion of MR. JUSTICE BRENNAN, wishes to make clear that he adheres to the view he expressed in *Younger* v. *Harris,* 401 U. S. 37, 58–65 (1971) (dissenting opinion), that federal abstention from interference with state criminal prosecutions is inconsistent with demands of our federalism where important and overriding civil rights (such as those involved in the First Amendment) are about to be sacrificed.

---

[4] Note, The Supreme Court, 1971 Term, 86 Harv. L. Rev. 50, 217–218 (1972).