No. 77–1032.  CITY OF COLUMBUS ET AL. *v.* LEONARD ET AL. C. A. 5th Cir.  Certiorari denied.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, dissenting.

Respondents were dismissed from their positions with the Columbus Police Department on May 31, 1971, for deliberately removing the American flag emblem from their uniforms during a public demonstration.  Four days later, respondents requested hearings before the Police Hearing Board, a state-created board to which officers could appeal their discharges. Counsel for respondents informed city officials that respondents "are anxious to have a hearing on these matters and request that all efforts be made to give us an early hearing date."  The Deputy Chief of Police responded by promptly notifying respondents that a "Police Hearing Board will be scheduled in the near future to hear your appeal and you will be notified of the time, date and place the hearing will be conducted."  Only a week after receiving the letter granting their request for a Police Hearing Board, respondents, apparently not satisfied to invoke only the state review process, also filed the federal civil rights action now before us.  Respondents claimed, *inter alia,* that the failure to accord them a hearing before they were discharged violated both their Fourteenth Amendment right to due process *and* Columbus City Ordinance No. 71–7 (1971).[1]

---

[1] The second prayer of the respondents' complaint asked:

"2. That, this Court exercise its pendent jurisdiction and Chief of Police, B. F. McGuffey be preliminarily and permanently enjoined from dis-

Hearings were initially scheduled before the Police Hearing Board for June 28, 1971, but, at the request of respondents' counsel, postponed until mid-July. The dismissals of respondents Leonard and White were unanimously upheld by the Board; the remaining dismissals were upheld on 4–2 votes. Although review of the Board's decisions was clearly available in state court, see *Ball* v. *Police Committee of City of Atlanta,* 136 Ga. App. 144, 145, 220 S. E. 2d 479, 480 (1975), respondents chose not to avail themselves of the further state proceedings. Instead, having lost in the first stage of the state remedial process, respondents decided to change horses and pursue their action in federal court.

On April 17, 1975, the District Court for the Middle District of Georgia dismissed respondents' federal action. The District Court ruled that respondents could not pursue state remedies part way and then switch in midstream to a federal forum; having chosen initially to invoke state remedies, that route must be exhausted.

> "[Respondents] seek to relitigate the same cause of action, based on the same set of facts, merely by changing legal theories and sovereignties. They do so despite the availability of a state process of judicial review of decisions of quasi-judicial tribunals such as the Police Hearing Board."

Dismissal of respondents' complaint was also supported by federal principles of abstention, since respondents claim for relief relied in part

> "on the alleged misapplication of a local ordinance which

---

charging plaintiffs . . . on the grounds that he lacks the power or authority under City of Columbus Ordinance 71–7 to discharge police officers summarily as he did on May 31, 1971, and enjoin the Chief of Police, the Police Department and all other defendants from refraining to reinstate said plaintiffs and from withholding back pay from May 31, 1971."

Petitioners also claimed that their dismissals violated their First Amendment rights of speech, association, and petition.

[respondents] ask this Court to construe in their prayers for relief. The present federal action seeking reinstatement would have been obviated had the [respondents] prevailed in their view before any of the four levels of state tribunals available to them."

The Court of Appeals for the Fifth Circuit reversed, holding, without detailed analysis, that the District Court should have reached the merits of respondents' claims. 565 F. 2d 957.

Petitioners contend, among other arguments, that respondents should be required to exhaust their state remedies before filing an action under 42 U. S. C. § 1983 and that the District Court therefore properly dismissed the action. In *Monroe* v. *Pape*, 365 U. S. 167 (1961), this Court held that one seeking redress for the deprivation of federal rights need not *initiate* state proceedings before filing an action under § 1983. 365 U. S., at 183. Here, however, we are confronted by a quite different and unanswered exhaustion issue—"that of the deference to be accorded state proceedings *which have already been initiated* and which afford a competent tribunal for the resolution of federal issues." Cf. *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592, 609–610, n. 21 (1975) (emphasis added). The District Court held that dismissal was in order under a doctrine that is best described as "they who invoke must also exhaust." Such a rule is not precluded by our prior decisions and indeed would seem to be supported by the logic of prior opinions. I would therefore grant certiorari to consider whether the Court of Appeals erred when it concluded that the District Court should have reached the merits of respondents' action.

Principles of federal-state comity have given rise to a number of limitations on the exercise of federal jurisdiction over state laws and actions. The equitable restraint doctrine enunciated in *Younger* v. *Harris,* 401 U. S. 37 (1971), holds that, absent "exceptional circumstances," a federal court should not interfere with pending state criminal or civil

proceedings in which the State has an important interest.[2]
See, *e. g., Huffman* v. *Pursue, Ltd., supra; Juidice* v. *Vail,* 430
U. S. 327 (1977) ; *Trainor* v. *Hernandez,* 431 U. S. 434 (1977) ;
*Moore* v. *Sims,* 442 U. S. 415 (1979).

The federal action must be dismissed not only where it
threatens to interfere with active state proceedings but also
where state proceedings have ended because of the failure of
the federal plaintiff to appeal an adverse state decision. In
*Huffman* v. *Pursue, Ltd., supra,* for example, a state trial court
ordered the respondent's theater closed and all personal prop-
erty used in its operation seized and sold. Rather than
appealing this decision, the respondent brought a § 1983 action
in federal court seeking to enjoin enforcement of the state
court's judgment. We held that the Federal District Court's
action in granting the injunction was improper under *Younger.*
Even though the state trial court judgment might have become
final, "a necessary concomitant of *Younger* is that a party . . .
must exhaust his state appellate remedies before seeking relief
in the District Court." 420 U. S., at 608.

> "Virtually all of the evils at which *Younger* is directed
> would inhere in federal intervention prior to completion
> of state appellate proceedings, just as surely as they would
> if such intervention occurred at or before trial. Inter-

---

[2] As noted in *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592, 600–601 (1975),
in *Younger* we recognized that the doctrine of equitable restraint "is
based in part on the traditional doctrine that a court of equity should
stay its hand when a movant has an adequate remedy at law, and that
it 'particularly should not act to restrain a criminal prosecution.' [401
U. S.,] at 43. But we went on to explain that this doctrine 'is reinforced
by an even more vital consideration,' an aspect of federalism which we
described as

" 'the notion of "comity," that is, a proper respect for state functions, a
recognition of the fact that the entire country is made up of a Union of
separate state governments, and a continuance of the belief that the
National Government will fare best if the States and their institutions are
left free to perform their separate functions in their separate ways.'
*Id.,* at 44."

vention at the later stage is if anything more highly duplicative, since an entire trial has already taken place, and it is also a direct aspersion on the capabilities and good faith of state appellate courts. . . .

"Federal post-trial intervention, in a fashion designed to annul the results of a state trial, also deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction. We think this consideration to be of some importance because it is typically a judicial system's appellate courts which are by their nature a litigant's most appropriate forum for the resolution of constitutional contentions. Especially is this true when, as here, the constitutional issue involves a statute which is capable of judicial narrowing. In short, we do not believe that a State's judicial system would be fairly accorded the opportunity to resolve federal issues arising in its courts if a federal district court were permitted to substitute itself for the State's appellate courts." *Id.,* at 608–609.

Here, the state proceedings were initiated by respondents rather than by the State. But this only strengthens the rationale for requiring respondents to exhaust their state appellate remedies. Respondents invoked the resources of the State to vindicate what they believed to have been illegal dismissals. Having lost the first round of this contest, they should not be allowed to abandon it and transfer the contest to another arena. As in *Huffman,* such belated forum shifting is "highly duplicative" and "a direct aspersion on the capabilities and good faith of state appellate courts." Action by a federal district court also would deprive the state appellate courts "of a function which quite legitimately is left to them."

A requirement that respondents exhaust state remedies that they have themselves initiated is particularly appropriate here

where respondents' claim for relief rests in part on state law. On appeal, the Georgia courts may well have found that the dismissal of respondents without a hearing was unlawful under Columbus City Ordinance No. 71–7 (1971), obviating much, if not all, of respondents' federal claim for relief and avoiding the federal constitutional issues that the District Court may now have to decide. In *Boehning* v. *Indiana Employees Assn.*, 423 U. S. 6 (1975), a discharged employee brought suit in federal court under § 1983 alleging procedural due process violations even though "controlling state statutes, as yet unconstrued by the state courts, might require the hearing demanded . . . and so obviate decision on the constitutional issue." 423 U. S., at 6. We held that under these circumstances the District Court properly decided to "abstai[n] until construction of the Indiana statutes had been sought in the state courts." *Ibid.* The similar abstention concerns present here, in combination with respondents' invocation of their state remedies, support the District Court's dismissal of respondents' action because of their failure to exhaust state appellate remedies.

As noted earlier, *Monroe* v. *Pape* is not to the contrary. In *Monroe,* we merely held that a federal plaintiff need not *initiate* state proceedings before filing a § 1983 action. According to the Court, this conclusion flowed from the purpose of the Civil Rights Act "to provide a federal remedy where the state remedy, though adequate in theory, *was not available in practice.*" 365 U. S., at 174 (emphasis added). Here, after deliberately invoking state review proceedings, respondents should not be heard to challenge the state procedures as either "not available in practice" or otherwise inadequate. Nor indeed have respondents attempted to raise such a challenge.

Quite apart from this distinction, the time may now be ripe for a reconsideration of the Court's conclusion in *Monroe* that the "federal remedy is supplementary to the state remedy, and

the latter need not be first sought and refused before the federal one is invoked." *Id.*, at 183. As noted earlier, the Court believed that this conclusion followed from the purpose of the Civil Rights Act "to provide a federal remedy where the state remedy, though adequate in theory, *was not available in practice.*" *Id.*, at 174 (emphasis added). But this purpose need not bar exhaustion where the State can demonstrate that there is an available and adequate state remedy. Indeed, scholarly commentators have soundly criticized the Court for holding to the contrary. See, *e. g.*, Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 82 Harv. L. Rev. 1486 (1969). In *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 663 (1978), the Court, in examining another section of *Monroe* v. *Pape,* "overrule[d] *Monroe* v. *Pape* . . . insofar as it holds that local governments are wholly immune from suit under § 1983." The Court having reopened that portion of *Monroe* v. *Pape,* I would take the opportunity afforded by this case to reconsider the Court's conclusion as to exhaustion of state remedies. Not only is the Court's conclusion open to serious question, as noted earlier, but the conclusion was reached in an almost off-the-cuff manner, in distinct contrast to that portion of *Monroe* overruled by the Court in *Monell.*

For all of these reasons, I dissent from the denial of certiorari.