In the Matter of the Application of Warren TEPPER, John A. Cooper, Lee J. Isabell, Marjorie Lee, Joseph Passaretti, Nicholas Poulous, Eleanor Sawyer, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

James GALLOWAY, Superintendent of Schools, and the Board of Education of the Wyandanch Union Free School District, Defendants.

No. 79 C 3083.

United States District Court,
E. D. New York.

Dec. 21, 1979.

Paul E. Klein, Plainview, N. Y., for plaintiffs.

Pachman, Oshrin & Block, P. C., Commack, N. Y., for defendants.

## MEMORANDUM AND ORDER

GEORGE C. PRATT, District Judge:

At least five times in the past five years, and four times in the past twelve months,[1] New York public employees have argued to a federal district court that the penalty provisions of the Taylor Law violate due process because (1) the penalties are assessed without recourse to an impartial tribunal and (2) the penalty procedures amount to an illegally severe prejudgment garnishment of wages.

This, the sixth suit in the series, arises out of the Wyandanch teacher strike of 1979, a strike which was unusually long and bitter. The matter was brought on by plaintiffs' order to show cause seeking preliminary relief, at 5:00 p. m., December 11, 1979. At oral argument, the parties agreed that no material issue of fact was in dispute, and that the court could properly proceed to a final decision on the merits based on the argument and the papers submitted. Accordingly, pursuant to F.R.C.P. 65, plaintiffs' motion for a preliminary injunction is consolidated with trial on the merits. For the reasons set forth below, judgment is granted in favor of defendants and the complaint is dismissed.

1. The five cases are, in chronological order, *Kornit v. Board of Ed.*, 75 C 518 (E.D.N.Y., July 22, 1975), remanded 542 F.2d 593 (CA2 1976), remanded 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978), affirmed on original opinion below, 591 F.2d 1330 (CA2 1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1281, 59 L.Ed.2d

## THE TAYLOR LAW

Analysis must begin with the Taylor Law itself. The Taylor Law was enacted in 1967:

> to promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government. These policies are best effectuated by * * * (e) continuing the prohibition against strikes by public employees and providing remedies for violations of such prohibition. New York Civil Service Law § 200 [hereinafter references to Article 14 of the Civil Service Law, popularly known as the Taylor Law, will be by Civil Service Law section number only].

The prohibition referred to in § 200 is expressly set forth in § 210.1 which reads: "no public employee or employee organization shall engage in a strike, and no public employee or employee organization shall cause, instigate, encourage, or condone a strike." Elsewhere, it is explained that "The term 'strike' means any strike or other concerted stoppage of work or slowdown of public employees." § 201.9.

The initial determination of whether an illegal strike has occurred is made by "the chief executive officer of the government involved", § 210.2(d), which also provides that:

> If the chief executive officer determines that such violation has occurred, he shall further determine, on the basis of such further investigation and affidavits as he may deem appropriate, the names of employees who committed such violation and the date or dates thereof. Such determination shall not be deemed to be final until the completion of the procedures provided for in this subdivision.

495 (1979); *Starrs v. Bock*, 77 C 5435 (S.D.N.Y. December 21, 1978), 12 P.E.R.B. 7501; *Wolkenstein v. Reville*, 77 C 618 (W.D.N.Y. June 11, 1979); *Local 2021 of District Council 37 v. New York City OTB Corp.*, 79 C 6005 (S.D.N.Y. November, 1979); and *Cheeseman v. Carey*, 79 C 4265 (S.D.N.Y. September 8, 1979).

Once the chief executive officer has "determined" that an illegal strike has occurred, and has identified the employees involved, he shall:

forthwith notify each employee that he has been found to have committed such violation [,] the date or dates thereof and of his right to object to such determination pursuant to paragraph (h) of this subdivision; he shall also notify the chief fiscal officer of the names of all such employees and of the total number of days, or part thereof, on which it has been determined that such violation occurred. Notice to each employee shall be by personal service or by certified mail to his last address filed by him with his employer. § 210.2(e).

The Taylor Law allows an employee determined to have engaged in an illegal strike to file "objections" to this determination with the chief executive officer. The chief executive officer must evaluate the objections, and refer any material questions of fact to a hearing officer appointed by the chief executive officer. Throughout the proceedings, the employee bears the burden of proving that he was not involved in an illegal strike on the day or days in question. The employee must overcome a statutory presumption that:

an employee who is absent from work without permission, or who abstains wholly or in part from the full performance of his duties in his normal manner without permission, on the date or dates when a strike occurs, shall be presumed to have engaged in such strike on such date or dates. § 210.2(b).

However, the determinations of the chief executive officer and his hearing officer are reviewable by Article 78 proceeding. § 210.2(h).

Once the chief executive officer has made his initial "determination" that an employee engaged in an illegal strike, the employee becomes subject to Taylor Law penalties:

Not earlier than [30] nor later than [90] days following the date of such determi-

nation, the chief fiscal officer of the government involved shall deduct from the compensation of each such public employee an amount equal to twice his daily rate of pay for each day or part thereof that it was determined that he had violated this subdivision; such rate of pay to be computed as of the time of such violation. In computing such deduction, credit shall be allowed for amounts already withheld from such employee's compensation on account of his absence from work or other withholding of services on such day or days. § 210.2(g).

These payroll deductions are what plaintiffs call the Taylor Law's "two for one penalties". A public employee determined to have engaged in an illegal strike receives no compensation while striking and is subject to later payroll deductions of one day's pay for each work day he was on strike. The payroll deductions are mandatory, and are not stayed by the filing of objections with the chief executive officer, or the commencement of an Article 78 proceeding. However, if the initial determination is later reversed, "The chief fiscal officer * * shall thereupon cease all further deductions and refund any deductions previously made pursuant to this subdivision." § 210.2(h).

These provisions of the Taylor Law constitute a comprehensive plan and procedure to deter strikes by public employees, by meting out quick and certain punishment to public employees who engage in illegal strikes. It is plaintiffs' contention that in the context of the Wyandanch strike, the Taylor Law penalties are too quick and too certain to comport with the due process clause of the constitution.

### THE TAYLOR LAW AND THE WYANDANCH STRIKE

■ There is no dispute that from September 17, 1979 through November 16, 1979 some 150 employees of the Wyandanch Union Free School District, including the plaintiffs, engaged in a strike in violation of the Taylor Law.[2] Superintendent Gallo-

---

**2.** It is similarly undisputed that plaintiffs violated state court orders enjoining the strikes dat-

ed September 13, September 15, and September 19, 1979. For these violations, plaintiffs'

way, the chief executive of the government involved, made his first official "determination" of an illegal strike on September 21, 1979, when he notified the approximately 150 affected employees by certified mail that a strike determination had been made.[3] Follow-up "determinations" were made by mailing additional letters on October 10, November 14, and November 16, 1979.[4] A total of 23 "objections" to the determinations were received by the chief executive officer.[5] None of these objections questions the superintendent's determination that an illegal strike occurred. Rather, the objections are to determinations that the absence of a particular employee on a particular day was due to the strike.[6] To date, the superintendent has neither ruled on the objections received nor appointed a hearing officer to resolve possible factual disputes.

During the strike, paychecks were not issued. Paychecks have not been issued since the strike ended on November 16, 1979, because of the Taylor Law payroll deductions. Payroll deductions began when the teachers returned to work on November 19, 1979, more than 30 and less than 90 days after the superintendent's "determination" of October 10, 1979. Pursuant to § 210.2(g), for each school day missed during the strike, a full day's pay is being deducted from plaintiff's pay after the strike (within the 30 to 90 day period). Thus, for their first 18 school days back on the job, November 19, 1979 to December 13, 1979, plaintiffs' earnings were cancelled out by deductions for the first 18 school days missed during the strike, September 16, 1979 to October 10, 1979, these days having been covered by the superintendent's "determination" of October 10, 1979. Then, on December 14, 1979, the determination of November 14, 1979 became grounds for deducting one full day's pay for the next 24 school days' work.[7] The deductions arising from the November 14 and November 16 determinations will cancel out plaintiffs'

---

union and some of its officers and members were held in contempt and fined by Justice McCarthy, Supreme Court Suffolk County, on October 9, 1979.

3. The date of a strike "determination" under § 210 is fixed at the date on which notices are sent to affected employees. *Matter of DeLea v. Board of Ed.*, 86 Misc.2d 988, 384 N.Y.S.2d 615, affirmed 53 A.D.2d 613, 385 N.Y.S.2d 942.

4. The Taylor Act calls for the chief executive officer to make a "determination" [singular] of an illegal strike. At about the time this federal action was commenced, Wyandanch teachers, including one plaintiff from this action, brought a suit in Suffolk County Supreme Court against the same defendants, arguing that the superintendent's multiple "determinations" violated the Taylor Law. Plaintiffs' motion for preliminary relief was denied by order of Justice Orgera dated December 10, 1979. Justice Orgera's accompanying memorandum noted that, under General Construction Law § 35, "words in the singular number include the plural, and in the plural number include the singular." Since this plural-singular argument was plaintiffs' "sole substantive claim" in the state court action, Justice Orgera denied preliminary relief, there being "little likelihood that the plaintiffs will be successful at the trial." Thus, it appears that under the Taylor Law as construed by Justice Orgera, multiple "determinations" are permitted.

5. Some of the objections may have been untimely. Civil Service Law § 210.2(h) requires that objections be filed with the chief executive officer "within [20] days of the date on which notice was served or mailed * * *." Superintendent Galloway's last "determination" was made on November 16, 1979. Thus, the 20 day period to object to this last determination expired on December 6, 1979. Two of the 23 objections attached to Superintendent Galloway's affidavit are stamped received by the Wyandanch school office on December 7, 1979. And all of the 23 objections were received more than 20 days after the superintendent's determinations of September 21 and October 10, 1979.

6. Counsel for defendants stated to the court that objecting employees will not be penalized for days on which their absence was justified by reasons unrelated to the strike.

7. This, of course, explains defendants' practice of making multiple "determinations" under the Taylor Law. In the face of a long strike, multiple determinations enable the public employer to threaten equally long periods without pay after the strike, notwithstanding the 90 day limitation of § 210.2(g). The key is that with staggered determinations, the public employer can create staggered statutory 90 day periods.

earnings for the rest of this month, and, it appears, at least well into January, 1980. Thus, the Taylor Law's two for one penalty provisions applied to the 41 day Wyandanch school strike will effectively deprive plaintiffs of their paychecks from September 1979 through January 1980, approximately the first half of the school year.

The severity of this deprivation is demonstrated in the affidavits of the named plaintiffs. Plaintiff Joseph Passaretti, for instance, states that:

The imposition of the entire forty-one (41) day deduction during the 60-day period is unjust and will cause me and my family irreparable harm since I am currently paid a gross salary monthly of $1,800. After withholding, my net income for this monthly period is $1,360. Deductions for the fines will amount to $4,920. This will leave me with zero income during the 60-day period.

I have not been paid at all by the Wyandanch Union Free School District since my return to work on November 19, 1979.

This is grossly unfair and an additional hardship since I obviously have not been paid since September 17, 1979 making my financial situation impossible and I believe that I will be unable to provide my family with adequate food, clothing and medical care. Also, I will not be able to pay bills already due.

I currently have the following monthly expenses for the necessary support and medical care required by my family:

$293 mortgage; $230 home maintenance; $400 food; $65 automobile. If my take home pay is reduced to zero, I will obviously be unable to supply these necessities.

I also have outstanding loans to pay off totaling $306 per month plus $150 per month for credit cards.

I believe that my situation is similar to that of the other members of the class who will be subjected to the penalties. I believe that I can fairly and adequately represent the class. Affidavit of Joseph Passaretti, Ex. A to the complaint.

One can quarrel with Mr. Passaretti's calculations. The $4,920 appears to represent paychecks withheld during the strike as well as the Taylor Law penalties applicable now that the strike is over. Thus, it appears that only some $2,500 remains to be deducted from Mr. Passaretti's earnings. However, due to the staggered multiple "determinations" (see footnote 7), deductions may extend beyond what Mr. Passaretti terms "the 60-day period". Despite these discrepancies, it remains clear that the Taylor Law payroll deductions will impose a severe financial strain on Mr. Passaretti, and on other affected employees.

## ABSTENTION

Defendants in this case, following defendants in most or all of the five previous Taylor Law cases listed in footnote 1, argue that abstention is appropriate. For reasons set forth below, the court rejects defendants' abstention arguments and related arguments improperly categorized under "abstention".

Defendants begin by pointing to the parallel state court action brought by Wyandanch teachers. The state court action confined itself to issues of state law, carefully avoiding any mention of the constitutional challenges brought in this suit. Defendants argue that "this [constitutional] challenge could have been and should have been raised in the state proceeding", and that the failure to do so bars the instant suit. This argument ignores *Lombard v. Board of Ed.*, 502 F.2d 631 (CA2 1974), *cert. denied*, 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975); *Winters v. Lavine*, 574 F.2d 46 (CA2 1978), cases which hold that in this circuit a litigant under 42 U.S.C. § 1983 can preserve federal constitutional claims for his federal court action by omitting them from his state court action. These two cases similarly dispose of defendants' charge that "the plaintiffs commenced separate state and federal actions to split their causes of action in order to forum shop and to get 'two bites at the apple'; to wit: to get either a federal or state court to issue a preliminary injunction pending an ultimate

decision on the merits." Defendants' brief at 8–9. While that may be a fair description of what plaintiffs have done, the strategy is clearly permissible in this circuit.

Defendants next argue that *Pullman* abstention is appropriate, *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), since "the federal court's decision on a constitutional issue may be rendered unnecessary by a decision of a state court as to a matter of law", citing *Goldberg v. Carey*, 462 F.Supp. 872 (E.D.N.Y.1978) *aff'd.* 601 F.2d 653 (CA2 1979). The plaintiffs in *Goldberg* challenged the constitutionality of a complex 1977 amendment to the New York Insurance Law. The Second Circuit affirmed the district court's decision to abstain, because there was pending a comprehensive state court suit, in which state court interpretation of the new insurance provisions would necessarily moot many of plaintiffs' federal constitutional claims.

Here, in contrast, plaintiffs challenge the constitutionality of Taylor Law provisions first enacted in 1967. Although the Taylor Law was amended in 1969, 1971, 1977 and 1978, its basic procedural system has remained intact (and the substantive changes have only softened its penalties). Not only is the Taylor Law less recent than the insurance law involved in *Goldberg v. Carey*, but the Taylor Law has already been comprehensively construed by New York's highest court in *Sanford v. Rockefeller*, 35 N.Y.2d 547, 364 N.Y.S.2d 450, 324 N.E.2d 113 (1974), appeals dismissed for want of a substantial federal question *sub nom., Collins v. Carey and Sanford v. Carey*, 421 U.S. 973, 95 S.Ct. 1972, 44 L.Ed.2d 464 (1975).[8] Thus, this case unlike *Goldberg v. Carey* does not involve a recent state law not yet construed by the New York courts.

Another important difference is that here the parallel state court suit involves only a narrow question of statutory construction, which will not moot the federal constitu-

tional issues presented to this court. Furthermore, the state court judge, in ruling upon a motion for preliminary relief, strongly indicated how he would ultimately decide that narrow issue, thus further reducing any need to await a final decision in the state court action. In short, the considerations which led to abstention in *Goldberg v. Carey* are largely inapplicable here.

■ Other general considerations weighing against abstention should also be mentioned. The courts have expressed reluctance about invoking *Pullman* abstention in civil rights suits brought under 42 U.S.C. § 1983. *Harrison v. NAACP*, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959) (Douglas, J., dissenting). Abstention in civil rights suits is particularly inappropriate where there is no genuine need to await state court construction of state statutes. As held in *Wisconsin v. Constantineau*, 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515: "Where there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim." Here, there is no material ambiguity in the provisions challenged by plaintiffs, and the ambiguity involved in the parallel state court action has been substantially resolved in the denial of preliminary relief. The court concludes that *Pullman* abstention is inappropriate in this case.

Leaving *Pullman* to one side, defendants next argue that abstention is nonetheless required by *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny, *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), and *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977). According to defendants, "the principles of *Younger* and *Huffman* are broad enough to apply to interference by a federal court with an on-going

---

8. The history of the *Sanford* case leading up to the 1974 Court of Appeals decision is as follows: *Sanford v. Rockefeller*, 70 Misc.2d 833, 335 N.Y.S.2d 502 (Supreme Court Albany County), modified, 40 A.D.2d 82, 337 N.Y.S.2d 688 (3d Dept. 1972), affirmed, 32 N.Y.2d 788, 345 N.Y.S.2d 543, 298 N.E.2d 681 (1973), vacated and remanded *sub nom., Sanford v. Wilson*, 416 U.S. 977, 94 S.Ct. 2377, 40 L.Ed.2d 755 (1974).

civil enforcement and (sic) action such as this, brought by the state in its sovereign capacity." Defendants' brief at 4–5.

Defendants fail to elaborate how *Younger* applies to this civil suit brought by public employees against their public employer. The issue is treated in some detail, however, by Judge Gagliardi in *Starrs v. Bock* (see footnote 1).

In *Starrs*, Judge Gagliardi discussed the *Younger* line of cases. He then noted that: "New York State's interest in preserving the Taylor Law's administrative remedies free of federal court interference is undoubtedly substantial." 12 P.E.R.B. at 7503. This was followed with a quotation from *Kiernan v. Lindsay*, 334 F.Supp. 588, 597 (S.D.N.Y.1971) (three judge court), *affirmed* 405 U.S. 1000, 92 S.Ct. 1295, 31 L.Ed.2d 472 (1972):

> The Taylor Law is not a casual piece of state legislation. It presents a comprehensive substantive and procedural program for determining the rights and obligations of public employees and their public employers. * * * It is clear that a most vital and sensitive part of the program involves the procedural due process to be provided in the event of a strike and the imposition of sanctions. *Starrs*, 12 P.E.R.B. at 7503.

Viewing the Taylor Law penalty procedures as an "administrative program", Judge Gagliardi concluded that:

> Unnecessary federal court interference with this administrative program might subvert New York's interest in resolving public employee disputes with a minimum of delay. * * *
>
> The Court of Appeals for the Second Circuit has read [recent Supreme Court cases] to indicate that the existence of a state administrative remedy suffices to trigger *Younger* concerns, *McCune v. Frank*, 521 F.2d 1152, 1158 (2d Cir. 1975); *see Anonymous v. Association of the Bar*,

515 F.2d 427, 432 n.3 (2d Cir. 1975) and several decisions in this district have followed suit. *See*, e. g., *Schacter v. Whalen*, 445 F.Supp. 1376 (S.D.N.Y.1978); *Buffalo Teachers' Federation, Inc. v. Helsby*, 435 F.Supp. 1098, 1191 (S.D.N.Y. 1977); *Lang v. Berger*, 427 F.Supp. 204, 214–15 (S.D.N.Y.1977). This court agrees, interference with the state legislature's chosen administrative body during the performance of its designated function is no less an affront to state sovereignty than [is] disruption of pending state judicial proceedings.[9] *Starrs*, 12 P.E.R.B. at 7503–7504.

The first Court of Appeals case relied on by Judge Gagliardi, *McCune v. Frank, supra*, was a challenge by a county police officer to police department grooming regulations and administrative proceedings enforcing these regulations. A temporary restraining order enjoined the administrative proceedings, and this injunction was continued on consent pending the outcome of the federal challenge to the grooming regulations themselves. The Second Circuit remanded the case for consideration of whether plaintiff's challenge to the grooming regulations was barred by *res judicata*. At the end of its opinion, the Second Circuit noted that *Younger* abstention might apply to federal court interference with police department administrative proceedings. *Younger* would, of course, be inapplicable if the state tribunal, in *McCune* the police department administrative tribunal, were found to be biased against the plaintiff. "If on the other hand the bias claim is found to be without merit, the questions of *res judicata* and, if that is no bar, *Younger v. Harris*, will have to be decided before the rule's constitutionality can be assessed." *Id.* at 1158. This was the full extent of the Court of Appeals' abstention discussion in *McCune*.

---

**9.** Judge Gagliardi went on to consider whether abstention was nonetheless inappropriate due to plaintiffs' challenge to the impartiality of the state administrative tribunal. He held that "plaintiffs have made an insufficient showing of pecuniary bias either to excuse their failure to exhaust their administrative remedies or to prevail on the merits of their constitutional claims." Judge Gagliardi's finding of an inexcusable failure to exhaust administrative remedies appears to be a determination in favor of abstention.

*Anonymous v. Association of the Bar, supra,* discussed abstention in somewhat more detail. After reviewing the authorities, the Second Circuit held that *Younger* and its progeny prohibit federal court interference in on-going state administrative proceedings to discipline an attorney for misconduct:

> Today more than ever, the integrity of the bar is of public concern and the state which licenses those who practice in its courts, and which is the only body that can impose sanctions upon those admitted to practice in its courts, should not be deterred or diverted from the venture by the interloping of a federal court. As Mr. Justice Frankfurter observed in *Theard v. United States,* 354 U.S. 278, 281 (1957) the "two judicial systems of courts, the state judicatures and the federal judiciary, have autonomous control over the conduct of their officers, among whom, in the present context, lawyers are included." *Id.* at 432.

The administrative disciplinary proceedings of the attorney in the above case had not yet reached the Appellate Division. Nonetheless, abstention was held to be appropriate since the disciplining of state attorneys is a matter ultimately within the exclusive control of the state courts, "who should not be deterred or diverted from the venture by the interloping of a federal court."

The "administrative proceedings" involved in this Taylor Law case are of a different sort. State courts are not intimately involved with the penalization of public employees under the Taylor Law. On the contrary, the Taylor Law's "administrative procedure" involves officials of the local government (here, the superintendent of schools and any hearing officer he may appoint).[10] State courts become involved only through review proceedings under Article 78 of the CPLR. Because administrative proceedings in school districts under the Taylor Law are exclusively local, federal court intervention constitutes less of an intrusion into state affairs, and the need for abstention decreases.

The "vital consideration" behind *Younger* abstention is:

> the notion of "comity" that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. *Younger, supra,* 401 U.S. at 44, 91 S.Ct. at 750 (quoted verbatim in *Huffman, supra,* 420 U.S. at 601, 95 S.Ct. 1200, and in *Juidice v. Vail,* 430 U.S. at 334, 97 S.Ct. 1211).

However, comity and a proper respect for state functions do not require abstention from deciding constitutional questions raised in the context of local school board penalty proceedings. *Younger* and its progeny do not yet extend so far as to require abstention in a case such as this.[11] Accordingly, this court declines to abstain, and proceeds to plaintiffs' two constitutional challenges to the Taylor Law.

## BIAS [12]

■ Plaintiffs' claim of unconstitutional bias is set forth clearly in the complaint:

**10.** The distinction between local officials and regional or state administrators was recently remarked on by the United States Supreme Court in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). *Lake County Estates* dealt with legislative immunity, not abstention, but the distinction between local and regional or state administrators has similar application in these related areas.

**11.** One federal court has reached a contrary conclusion. In *Local 2021, supra,* Judge Duffy held that abstention was appropriate. Judge Sofaer, in *Cheeseman,* and Judge Elfvin, in *Wolkenstein,* declined to abstain.

**12.** In *McCune,* the Second Circuit suggested that claims of bias should be considered before questions of abstention, because abstention in favor of a biased state tribunal would be improper. This court varies the order of presentation for purposes of logical clarity, since as appears below plaintiffs' bias claim is without merit.

[T]he determinations that plaintiffs and all other members of the class participated in the alleged strike were made or will be made by Defendant Galloway who, by virtue of his status as the chief executive officer of the District at the time of the making of such determination, had and has a pecuniary interest in rendering a determination adverse to plaintiffs and the class, and by reason thereof, Defendant Galloway was not and could not be an impartial or neutral adjudicator of the rights and interests of plaintiffs and the class. Accordingly, the procedures provided in CSL § 210.2 are unconstitutional on their face and as applied to plaintiffs and the class who in turn are being deprived of their property (wages) without due process of law in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States and Title 42, United States Code, Section 1983.

At no time under statutory procedures are plaintiffs and the class afforded the opportunity for a full and fair hearing before an impartial tribunal or hearing officer, since *inter alia*, the hearing officer is the Superintendent's appointee. Complaint, ¶¶ 36–37.

The same claim was presented to Judge Gagliardi in *Starrs, supra.* Judge Gagliardi there observed that the New York Court of Appeals in *Sanford* did not have this particular due process claim before it, and "the issue of the superintendent's pecuniary bias was not before the Supreme Court when it summarily dismissed the *Sanford* appeals." *Id.* at footnote 7. Accordingly, Judge Gagliardi gave the question *de novo* consideration.

He began with a review of the authorities, including the leading case of *Hortonville Joint School District v. Hortonville Education Association*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976). He then turned to *Kornit v. Board of Ed.* (see footnote 1), a case which "involved facts virtually identical to those of the instant case". It was noted that Judge Judd in *Kornit* had granted summary judgment against plaintiff's bias challenge to the Taylor Law. Judge Gagliardi held *Kornit* to be controlling:

Plaintiffs have alleged no facts which makes this case distinguishable from Kornit. Accordingly the court must conclude that plaintiffs have made an insufficient showing of pecuniary bias either to excuse their failure to exhaust their administrative remedies or to prevail on the merits of their constitutional claims. Accordingly, the motion to dismiss is granted. *Starrs*, 12 P.E.R.B. at 7505.

In the instant case, plaintiffs have alleged no facts to distinguish their bias claim from the bias claims rejected in *Kornit* and *Starrs*.[13] Nor has the law changed since *Kornit* and *Starrs* were decided: the cases cited to this court by the parties are the same cases analyzed extensively by Judge Gagliardi. Thus, *Kornit* and *Starrs* stand as unrefuted authority, requiring dismissal of plaintiffs' bias claims in this suit.[14]

## PREJUDGMENT GARNISHMENT

 Plaintiffs' claim of prejudgment garnishment is set forth in the complaint as follows:

The making of the deductions pursuant to Section 210.2(g) from the wages of plaintiffs and the class pursuant to the afore-

---

13. One possibly relevant factual difference is that the three individual plaintiffs in *Kornit* and *Starrs* failed to file "objections" with the chief executive officer of the involved government. Here, in contrast, 23 objections were filed by the approximately 150 affected employees (but see footnote 3). However, despite the absence of formal objections in *Kornit* and *Starrs*, these decisions gave full consideration to plaintiffs' bias claims. Thus, the actual filing of objections in this case does not undercut the authority of *Kornit* or *Starrs*.

14. One federal court has reached a contrary conclusion. Claims of the chief executive officer's institutional bias were not discussed in two of the Taylor Law cases cited in footnote 1: *Local 2021* and *Cheeseman*, while bias claims were held to state a cause of action in *Wolkenstein*. However, Judge Elfvin in that case noted that "defendants ignored this facet of the complaint in their brief." Thus, *Wolkenstein* may have been decided without citation to *Kornit* and *Starrs*.

said determinations and before such determinations are final and before plaintiffs and the class have been afforded the opportunity for a full and fair hearing, will constitute a prejudgment garnishment of their wages and, therefore, is an unconstitutional deprivation of the property rights of plaintiffs and the class without due process. Complaint, ¶ 38.

The same claim was made in at least four of the five previous Taylor Law cases cited in footnote 1. The claim was rejected in *Kornit* and *Starrs*. It survived a motion to dismiss in *Wolkenstein*. And it was found to have "substantial merit, warranting the issuance of the limited restraining order which has been filed" in *Cheeseman*.

None of these cases, however, discussed or analyzed the prejudgment garnishment claim in detail. The claim raised in this case does not focus on the lack of a pregarnishment hearing, so much as on the speed and resulting severity of the "garnishment". Due to the unusual length of the strike, 100% of the plaintiffs' paychecks has been "garnished" for the two pay periods since the strike. As explained earlier in the opinion, this 100% "garnishment" may continue through January, 1980, as the heavy Taylor Law penalties resulting from the 41 school day strike continue to be deducted during the staggered 60 day periods (see footnote 7, *supra*). Plaintiffs concede their duty to pay the two for one Taylor Law penalties, but argue that the payment periods should be extended, so that a limited amount would be "garnished" from each paycheck, thereby diminishing the severe impact of immediate "garnishment" on plaintiffs.

In *Cheeseman, supra*, Judge Sofaer held that exactly this prejudgment garnishment claim had "substantial merit". The pertinent part of Judge Sofaer's analysis is set forth below:

Due process is ultimately a question of degree; a statute that is lawful in general may be applied in such a manner that it becomes fundamentally unfair. Although the absolute amount of the penalties contemplated in this case may be justifiable under due process, without any prior hearing, the speed with which the penalty is exacted is a matter of independent concern. Here, the State asserts that it is bound by Section 210 to take the full penalty out of plaintiffs' salaries no sooner than 30 but no more than 90 days after the Director's determination. Instead of taking the full amounts due in one lump sum, the State has consented to withhold the funds in four equal installments during four two-week pay periods.

The State's exaction of penalties commenced with the pay period ending September 5. Those plaintiffs not regularly paid on September 5, are scheduled to be paid on September 12; their pay will also be reduced in accordance with the State's present schedule. The issue to be considered is whether future pay reductions should be required to proceed on a more extended schedule than is currently planned.

The parties agree that the total penalty to be imposed on the average plaintiff in this case is roughly 16 days' pay. If that amount is taken proportionately from four consecutive paychecks, approximately four days' pay will be taken from the paychecks of most of the plaintiffs. * *

Affidavits submitted by several named plaintiffs and others indicate that take-home pay for those in plaintiffs' class amounts to roughly $400 each pay period. Such plaintiffs receive approximately $63 per day in gross wages. Based on a ten day pay period, the total reduction in pay contemplated by the State for each pay period would be about $260, leaving a take-home pay of $140 for a two-week period. Those plaintiffs earning less would suffer roughly the same proportionate reduction in pay—40% of gross salary and well over 50% of take-home salary.

To leave employees with so small a portion of their wages, for a two-month period, creates an extreme hardship. The affidavits on file indicate that most of the employees involved have families to

support. Some have support and alimony payments to make. Many must make monthly mortgage or other payments. Furthermore, in addition to the expected hardships these dedications will cause, the record already contains evidence that some individuals have received paychecks for the last pay period of as little as $3.30 and $11.50. [footnote omitted]. This court's determination that deductions must proceed on a more extended basis does not rest on a subjective view of fundamental fairness alone. Rather, the court is impressed by the fact that many states, as well as the federal government, have passed statutes severely limiting the amounts which may be garnished from an individual's wages. New York, for example, has provided that no more than 10% of gross income regularly received may be garnished by any creditors at any time. [statutory citations omitted]. Indeed, no statute that the parties have been able to find permits the garnishment of over 25% of gross income; and many limit garnishment to substantially less. *See* Appendix.

The strength of this analogy is reinforced by the fact that, to proceed under the garnishment laws, a party must usually have a final judgment against the wage earner. Here, by contrast, the State is proceeding without even having granted plaintiffs a hearing on the penalty, and is seeking to extract over 50% of take-home pay. A practice so out of line with the national consensus is extremely suspect, and there is a substantial burden of justification.

The second consideration that leads me to conclude that the rate of exaction may well violate due process is the time the State is likely to take before granting hearings to plaintiffs, and the degree of reliability the Director's determination is likely to have. Prior practice reflects that hearings will not commence until about six months after the Director's determination, which was made on or about July 20, 1979. Since over 6,500 employees have requested hearings, it will be a long time after hearings commence before all

employees will have had a chance to secure repayment of salary deducted because of the strike. Furthermore, prior experience, including *Sanford*, indicates that many employees will succeed in recovering part or all the salary deducted. In *Sanford*, for example, some 500 teachers proved that they had been improperly determined to be on strike. They recovered all the pay they had lost. Many more recovered part of the pay deducted. Though these corrections reflect well on the adequacy of the State's hearing process, they show that the Director's determinations as to which individuals were on strike and for how long are not so reliable as to justify the extreme hardship now threatened.

Based on these considerations, an order has been entered allowing the State to deduct up to two days wages per pay period from the pay of all persons in the plaintiff class, expanded by agreement to include all participants in the strike to whom Section 210 could be applied. The State is free to move for a hearing within ten days of the order in this case, on any ground, including possible abstention on the limited issue on which the plaintiffs have temporarily prevailed. Meanwhile, no deductions are to be made from the paychecks of any employee for the next two pay periods * * * in light of the large deductions made during the last two pay periods. Deductions may thereafter commence under the terms of this court's order until it is vacated after hearing or on appeal. If the State complies with this order, it will naturally be doing so under compulsion. Hence, no affected employee would be permitted to claim that deductions made after the 90 day statutory period are illegal. Such deductions must be made if necessary to comply with this court's order. *Cheeseman, supra*, at 7 through 12.

Judge Sofaer's decision focused on "the time the State is likely to take before granting hearings to plaintiffs, and the degree of reliability the Director's determination is likely to have." This concerned

Judge Sofaer, "[s]ince over 6,500 employees have requested hearings * * *." Here, in contrast, the 150 affected employees have filed a total of 23 objections. None of these objections question the occurrence of an illegal strike. No hearings have been scheduled, and none may be necessary. In this context, the reliability of the strike determinations and possible delays in the hearing of objections are, at most, insignificant factors.

Judge Sofaer's other concern was the severity of the garnishment, since "To leave employees with so small a portion of their wages, for a two-month period, creates an extreme hardship." Of course, the hardship is even greater in this case where plaintiffs have received no wages for the past three months, and will receive no wages for at least another month if the Taylor Law deductions are not enjoined or modified by this court. Plaintiffs' affidavits convincingly show the severe impact of this prolonged payless period on the affected employees. Alimony payments, mortgage payments, and other fixed debts, along with daily household expenses, threaten to overwhelm at least some of the teachers involved in this strike. The finances of other teachers will be stretched thin, of not overwhelmed, by the continued absence of paychecks.

This court is, of course, sympathetic to the human plight of these public employees. However, the mere existence of hardship, even severe hardship, does not itself create a valid constitutional claim. On the equities, plaintiffs have engaged in an illegal strike and at all times were aware of the statutory penalty facing them should they elect to return to work with the school district. Reduced to its basics, plaintiffs' argument would have this court amend the Taylor Law by spreading its penalty over a longer period than the legislature mandated. This the court cannot do. Plaintiffs' constitutional claim must stand or fall on their argument that the Taylor Law penalty deductions constitute a prejudgment garnishment, so severe as to violate the due process clause. Prejudgment garnishment, without a proper hearing, of a wage earner's salary, was held to violate the due process clause in *Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). By analogizing Taylor Law penalty deductions to prejudgment garnishment of wages, plaintiffs seek to apply the *Sniadach* rule to this case. Plaintiffs' claim must be rejected, because Taylor Law penalty deductions are significantly different from prejudgment garnishment remedies.

The difference appears most clearly in the purpose of the two procedures:

> Garnishment and attachment remedies afford the actual or potential judgment creditor a means of assuring, under appropriate circumstances, that the debtor will not remove from the jurisdiction, encumber, or otherwise dispose of certain assets then available to satisfy the creditor's claim. [footnote omitted]. *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 610, 95 S.Ct. 719, 724, 42 L.Ed.2d 751 (1975) (Powell, J., concurring).

In contrast, Taylor Law penalty deductions are not intended to preserve assets pending ownership determination. Rather, they are intended to be penal in nature. The state's interest in applying penalty deductions against striking public employees is clearly different from the state's interest in safeguarding the assets of debtors prior to judicial determination of ownership. This difference affects the instant plaintiffs' due process claims, since due process analysis requires a: "careful assessment of the nature of the governmental function served by the challenged procedure and of the costs the procedure exacts of private interests". *North Georgia Finishing, Inc. v. Di-Chem, Inc., supra*, at 610, 95 S.Ct. at 724 (Powell, J., concurring.)

Such a careful assessment was recently undertaken by the New York Court of Appeals in *Sanford v. Rockefeller, supra*. The *Sanford* plaintiffs raised a host of due process challenges to the Taylor Law, focusing on the summary imposition of penalties prior to any hearing. The New York Court of

Appeals considered plaintiffs' claims in light of "the need to balance the government's interest against the nature and extent of the individual's deprivation." 35 N.Y.2d at 563, 364 N.Y.S.2d at 462, 324 N.E.2d at 122. After an extensive analysis of the Taylor Law and of recent Supreme Court due process cases, the Court of Appeals reached the following conclusions:

> The problem of a strike, in direct or masked form, by masses of public employees is unlike any of the situations to which the "due process" cases above discussed have addressed themselves. For three decades the Legislature has experimented with various schemes to maintain public services against the coercive threat or fact of a public employee strike. All of the schemes in one way or another have tried to protect the employee[']s "right to his job", while also providing an effective deterrent against the strike as a weapon. At the same time it may be assumed that consideration was given to the fact that the public employee could make his influence felt and heeded by the Legislature and the executive. Indeed, the "automatic" tripping of sanctions in the various schemes, still used in the current "Taylor Law" [was] apparently deemed necessary to strengthen the hands of those who might be too "responsive" to the demands of massed public employees.

> The relatively adequate salary schedule of public employees with periodic across-the-board cost-of-living increases, plus the enviable health, hospital, and retirement benefits, demonstrate that the assumptions have been valid. All this, too, without the lawful strike as an economic weapon against non-profit government.

> It is with this backdrop that the Taylor Law should be assessed for fairness of procedure.

> In all the categories involving the taking of rights, property, jobs, and other benefits, the factor most important to be considered is the irreversible or irreparable harm which may be visited upon the person in the event that the sanction should not have been imposed. On this

view, the temporary suspension of tenure [pursuant to § 210.2(f), repealed by L.1978, c. 465, § 1, effective July 5, 1978] or imposition of fines under the Taylor Law is of no consequence. In the event of mistake the tenure right and payroll deductions are restored with retroactive effect.

> On the government's side there is a grave condition when the mass strike is contemplated. If hundreds, and more likely, many thousands, of administrative hearings are to be required automatically, prior to the imposition of the penalties afforded by the statute, with the usual resort to judicial review after the administrative hearing, the government service could be tied up internally for years and at great expense. * * * Most important, with the passage of time the substantive issue, as in these cases, gets lost in the procedural thicket. Obviously, such a system is not a deterrent but could well become an added weapon in the hands of those who might seek to bring pressure on the public employer. * * *

> The Taylor Law sanctions and procedure are not drastic. The sanctions are all reversible in both monetary terms and in status. The persons affected are not the impecunious or unemployed but the compensated holders of tenured positions in the service of an employer which cannot go bankrupt or withdraw from the market.

> Notably, there is no discharge, no termination of all compensation, but only limited payroll deductions and suspension of tenure. All of these are reversible without irreparable harm to the employee if it should eventuate that the sanctions were unjustly imposed. Comparing the Taylor Law sanctions with the payless suspensions, dismissals, and fines imposed by other laws governing civil servants they are markedly moderate. What is different is the summary procedure with a shifting of burden of proof, designed to meet the special problem of concerted mass action by employees. *Sanford, supra,* 35 N.Y.2d at 564–566, 364 N.Y.S.2d at 463–465, 324 N.E.2d at 124.

*Sanford's* due process analysis carefully weighed the competing interests of the state and the striking employees. The state's interest in deterring strikes by public employees was held to sufficiently justify the Taylor Law's summary imposition of monetary penalties. Indeed, the New York Court of Appeals held that *even more se-vere* penalties, involving temporary suspension of tenure, comported with due process.

 "[S]ummary procedure may well meet the requirements of due process in extraordinary situations." *Sniadach, supra,* 395 U.S. at 339, 89 S.Ct. at 1821 (1969). This court holds that an illegal strike by public employees, such as the admittedly illegal strike involved in this case, is a sufficiently extraordinary situation to justify the Taylor Law's summary payroll deduction procedure.[15]

### CONCLUSION

Plaintiffs' motion for preliminary relief is consolidated with trial on the merits pursuant to FRCP 65 and with the consent of the parties. The court declines to abstain, and grants summary judgment in favor of defendants against all of plaintiffs' claims. Since judgment is granted in favor of defendants, there is no need to rule on plaintiffs' request for class certification. The clerk is directed to enter judgment dismissing the complaint on the merits.

So ordered.

---

**15.** Plaintiffs throw in one other constitutional argument: that the withholding of paychecks after the striking employees' return to work constitutes involuntary servitude under the thirteenth amendment. This claim is frivolous and need not be further discussed.