John W. HEISSE, Jr., M.D.

v.

STATE OF VERMONT, Warren Cone, Commissioner of Vermont Department of Public Safety, and M. Jerome Diamond, Attorney General of the State of Vermont.

Civ. A. No. 79–312.

United States District Court,
D. Vermont.

Dec. 30, 1980.

Supplementary Memorandum of Decision Feb. 19, 1981.

Robert B. Hemley, Gravel, Shea & Wright, Ltd., Burlington, Vt., for plaintiff.

Michael Gadue, Asst. Atty. Gen., State of Vermont, Montpelier, Vt., for defendants.

## MEMORANDUM OF DECISION

HOLDEN, Chief Judge.

This is a civil rights action brought under 42 U.S.C. §§ 1981, 1983. Jurisdiction is based on 28 U.S.C. §§ 1343, 2201. The plaintiff is John W. Heisse, Jr., M.D., a board certified otolaryngologist duly licensed to practice medicine in the states of Vermont, Maryland and New York. He is also a practitioner in the field of truth and deception detection, particularly in the use of the Psychological Stress Evaluator (hereinafter the PSE). The PSE measures certain physiological phenomena reflected in the human voice. Defendant Warren Cone at the time the action was instituted was the Commissioner of Public Safety for the State of Vermont. The office is presently held by Paul R. Philbrook. Pursuant to 26 V.S.A. §§ 2901 *et seq.*, the Commissioner is charged with administering the professional activities of Vermont polygraph operators, including the issuance, suspension and revocation of licenses to administer polygraph or other truth or deception detection examinations. Defendant M. Jerome Diamond is the Attorney General of the State of Vermont. Both defendants are sued only in their official capacities.

Dr. Heisse's complaint alleges that as a PSE operator, he and others have been denied a license under Vermont's Polygraph Examiners Act, 26 V.S.A. §§ 2901 *et seq.*, (hereinafter the Act) because the statute has been restricted to licensing persons using the polygraph machine to detect deception or verify truth. Dr. Heisse claims that the Act violates rights protected by the equal protection and due process clauses of the Fourteenth Amendment of the United States Constitution by arbitrarily discriminating against those who use devices other than the polygraph for the purpose of truth and deception detection. The plaintiff also challenges the constitutionality of the Act on other grounds: he asserts that the Act's definition of "polygraph examiner" is impermissibly vague and overbroad; that the Act is special legislation designed to maintain a monopoly in favor of polygraph operators; that the Act delegates legislative power to the Commissioner of Public Safety without providing sufficient standards to govern its exercise. The complaint further charges that defendants' refusal to issue licenses to Dr. Heisse constitutes the taking of private property without due process as required by the Fourteenth Amendment. And finally, the plaintiff claims loss of income resulting from defendants' failure to issue him a license.

In his prayer for relief the complainant requests the court to declare the Act unconstitutional, to enjoin its enforcement, and to establish plaintiff's right to practice truth and deception detection without interference from defendants. In addition, he

seeks damages in the amount of $250,000 with interest, costs and attorney's fees.

The defendants responded to the complaint by moving to dismiss the action on several grounds. Defendants contend that the court lacks subject matter jurisdiction over the cause since the complaint does not present a "case or controversy" and the plaintiff is without standing to bring the suit. It is also defendants' contention that the court lacks jurisdiction over the action because the suit is in fact a petition for a legislative amendment. Defendants raise the Eleventh Amendment as a bar to a claim for damages against state officials. They additionally argue that the good faith qualified immunity afforded state official prohibits this action. Defendants' final assertion is that the doctrine of abstention precludes federal court review of the Act.

During the course of the hearings the court ordered the trial of the action on the merits be advanced and heard with the motion for preliminary injunctive relief as provided in Fed.R.Civ.P. 65(a)(2).

## FINDINGS OF FACT

### The Polygraph and PSE Machines

Four elements are involved in the examination of a subject to ascertain truth or deception: the person being examined who makes predictable responses to stress; a measuring device which records his responses; a structured examination for control; and an examiner who interviews the subject and evaluates the causes of stress. In certain circumstances, discussed herein, the person who conducts the interview and the individual who performs the analysis of the results may not be the same person. Some or all of these characteristics commonly apply to examining situations involving the use of the polygraph and the PSE.

Both the polygraph and the PSE operate on the principle that stress causes physiological changes in the body which can be measured to indicate whether the subject of the examination is telling the truth. During an examination in which a polygraph is used, sensors are attached to the subject so that the polygraph can mechanically record his physiological responses to a series of questions. The polygraph employs a blood pressure cuff attached to the subject's forearm or wrist to measure cardiac activity, tubes circumscribing his chest or abdomen to measure respiratory changes, and electrodes attached to his fingers to measure skin conductivity. During the examination period the polygraph examiner calls upon the subject to respond to ten or fifteen questions, leaving time for the body to normalize between each response. Several of the questions are control questions; the remaining ones constitute the relevant interrogatories. The questions are of the type which can be answered "yes" or "no." Typically, a polygraph examination session lasts no more than four or five minutes because longer periods cause discomfort for the subject.

One of the principal advantages of the use of the polygraph is that an individual cannot be subjected to a truth or deception detection examination without his knowledge. A disadvantage is that in some instances a subject's obesity or other medical condition may preclude its use. In addition, the fact that sensors are attached to the subject may induce stress and thus render the test results inconclusive.

The PSE measures change in the frequency modulation of the human voice. It determines pulse rate, blood pressure level, respiratory rate and micro-muscle tremor. Specifically it measures: a single respiratory utterance, the rate of glottic closure, the duration of an utterance, the micro-muscle tremor, the presence or absence of pulse as related to blood pressure, changes in pitch, general nervous tension, and the wave shape of voice frequency.

An examination involving the use of the PSE proceeds with the following steps. An interview with the subject is recorded on a tape recorder. The tape recording of the examination is electronically processed through the PSE which produces a graphic read out of the degree of stress or non-stress present in the subject's voice as he responds to questions. The charts are ana-

lyzed to determine the causes for the stress. The chart analysis and the initial interview may be performed by different persons.

The PSE offers several advantages. One is that since the subject is not wired to a machine, the examination conditions do not in themselves produce stress. In addition, the examination period may last longer than just a few minutes because the PSE does not use monitoring devices which cause discomfort to the subject. The subject may give narrative responses, rather than just monosyllabic replies. The disadvantages are twofold. An individual may be subjected to PSE analysis without his knowledge. In addition, the analyst may be a different person from the interviewer and consequently may not have observed the subject during the interview.

Numerous studies have analyzed the reliability of the PSE as a device for detecting truth and deception. Although several studies have concluded that the PSE is a reliable, workable instrument, there is disagreement in the scientific community about the validity of PSE testing.

### The Act

In 1975 the Vermont General Assembly enacted the Polygraph Examiners Act, 26 V.S.A. §§ 2901–2910. Section 2903 of the Act provides that "A person may not administer polygraph or other examination utilizing instrumentation for the purpose of detecting deception or verifying the truth of statements . . . without being licensed as a polygraph examiner" under the provisions of the Act.

Section 2902 establishes the minimum instrumentation required under the Act. It provides that "Any instrument used . . . for the purpose of detecting deception . . . shall record visually, permanently and simultaneously:

(1) A subject's cardiovascular pattern, and

(2) A subject's respiratory pattern."

The Act prohibits the "use of any instrument or device to detect deception which does not meet these minimum instrumenta-

tion requirements." The record of additional physiological changes is not proscribed by the statute.

Section 2904, which sets out the requirements for obtaining a license, provides that a prospective polygraph examiner licensee must complete not less than six months of internship training or such other training as the commissioner may prescribe. "Internship" is defined in Section 2901 as "the study of polygraph examination and of the administration of polygraph examination by a trainee under the personal supervision and control of a polygraph examiner in accordance with a course of study approved by the commissioner." To date the Department of Public Safety does not have an established internship program. Nor has training, other than the internship program, been prescribed by the Commissioner. Although the only persons who may supervise interns are licensed examiners, the Act does not impose upon licensed examiners an obligation to supervise interns.

Section 2901 defines "polygraph examiner" as any person who purports to be able to detect deception or verify the truth of statements through instrumentation or the use of a mechanical device." *Id.* The penalty for violating the Act is a fine of not more than $1,000.00 or imprisonment for not more than six months, or both. 26 V.S.A. § 2909.

Two opinions interpreting the Act have been rendered by the Attorney General's Office. The first was written by Assistant Attorney General Paul F. Hudson at the request of Francis E. Lynch, former Commissioner of the Department of Public Safety. Dated October 3, 1978, this opinion stated that the Vermont Act does not permit the issuance of a polygraph examiner's license to trained PSE examiners and that "they may not legally use the technique to determine truth or deception." It further stated that the PSE does not meet the minimum instrumentation requirements of the Act. A later opinion by Hudson, dated October 24, 1979, responded to a request for informal advice made by James L. Morse, Defender General. Hudson reiterated his

opinion that PSE examiners could not legally be licensed under the Act and that use of the PSE for truth or deception detection was subject to penalty under 26 V.S.A. § 2909.

In the 1978 Session of the Vermont legislature, Senate Bill S-231 was submitted to the House Committee on General and Military Affairs, after passing the Senate. The bill would have broadened the scope of the Act to include the PSE. Although its passage was supported by members of the Vermont State Police, it was not reported out of the House prior to adjournment.

### The Parties and the Events Leading Up to the Filing of the Action

John W. Heisse, Jr., M.D., is knowledgeable in the field of truth and deception detection. He is informed both in the area of forensic polygraph and in the use of the PSE. A charter member and past president of the International Society of Stress Analysts, Dr. Heisse has lectured and testified on the use of the PSE and its comparative reliability to the polygraph. Dr. Heisse has both practiced and instructed in the use of the PSE. He has conducted approximately 700 PSE examinations since 1971, 400–500 of which occurred following the enactment of the statutes in question. Although Dr. Heisse is qualified in both experience and training to be licensed as a polygraph operator, he prefers to use the PSE for the practice of truth and deception detection.

In 1975 Dr. Heisse applied for a license under the Act. He withdrew his application after State Police Commissioner Corcoran advised him that he did not require a license to use the PSE in connection with his practice as a physician. In December of 1975, however, Commissioner Corcoran stated that a license was required for the use of the PSE to detect truth or deception.

In 1978 Dr. Heisse, along with eleven other persons, applied for licenses under the Act. All expressed a preference for the use of the PSE. Among the eleven other applicants were Lt. Col. Charles McQuiston and Dr. Marilyn Van Graber, Ph.D. Col. McQuiston is a former intelligence officer for the U.S. Army who is licensed as a polygraph operator in both Florida and Virginia. During the 18 years preceding his application for a Vermont license, he conducted 8,500 polygraph examinations and 28,000 PSE examinations. He is a co-inventor of the PSE. Dr. Van Graber holds a Ph.D. in rhetoric and communication psychology. She has received extensive training in the use of the PSE and is a qualified instructor and examiner. Since 1976 she has worked as a communication consultant for Diogenes Affiliates, which provides truth verification services.

Following the issuance of the first opinion of the Assistant Attorney General, the Department of Public Safety rejected all twelve applications. Each application rejected was returned accompanied by a cover letter and a copy of the October 3, 1978 opinion of the Attorney General. The applications were rejected not because of the qualifications of the individual applicants, but because the Attorney General's opinion indicated that a PSE user could not be licensed under the statute.

Since the Act became law in 1975, Dr. Heisse has been informed on several occasions by members of the Vermont State Police Force that the use of the PSE in Vermont is illegal. In 1978 Sgt. Michael C. Vinton, then the State of Vermont's Chief Polygraph Examiner, told Dr. Heisse that his use of the PSE was contrary to Vermont law. On April 4, 1979, Corporal Wayne Heath of the Vermont State Police discussed age regression hypnosis with Dr. Heisse. Corporal Heath testified that he was instructed by his superiors to confiscate the tapes after the hypnosis session and he did so. The purpose of the confiscation was to prevent Dr. Heisse from using the tapes in PSE analysis.

The prosecuting attorney in Grand Isle County, Edward Cashman, advised Dr. Heisse that if Dr. Heisse used the PSE in Grand Isle County and a complaint were forwarded to his office, Mr. Cashman would prosecute Dr. Heisse for violation of the Act. Mr. Cashman testified, however, that he is not aware of any pending or concluded

investigation which would subject a person to criminal prosecution for use of the PSE device. Dr. Heisse also testified, as did Dr. Van Graber, that he does not know of any proceedings against either of them. Although Dr. Heisse has continued to conduct PSE examinations since being advised of its illegality, he feels he is not able to practice as freely or advertise as broadly as he might otherwise do.

### Motion to Dismiss

Defendants' first argument is that plaintiff's complaint does not satisfy the case or controversy requirement of justiciability. A prerequisite to the adjudication of constitutional issues under Article III of the Constitution is the presentation of concrete legal issues in the context of actual cases. To determine whether an actual controversy exists, the court is called upon to consider whether the facts as set out in the complaint demonstrate that there is a substantial controversy between parties whose legal interests are adverse. The controversy must be sufficiently immediate and real to justify declaratory relief. *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). The power of courts may be exercised when the interests of the parties before the court require protection from actual interference with the exercise of their rights. *Id.* at 110, 89 S.Ct. at 960.

This case sets out a controversy challenging the constitutionality of state licensing procedures. Plaintiff alleges that the licensing Act in question has violated his equal protection and due process rights. Specifically, Dr. Heisse alleges that he is being foreclosed from practicing his profession by the State's refusal to grant him a license under the Act. He also entertains fear of prosecution for his continued use of the PSE. Plaintiff's concerns are not speculative. He has been denied a license. He has been told by members of the Vermont State Police that practicing the profession using the PSE is unlawful in Vermont. He has received notice from the Grand Isle's State's Attorney that he will be prosecuted if a complaint is filed with that office.

Defendant has made much of the fact that plaintiff is not currently under investigation, nor is he presently accused. But a person is not required to undergo arrest and prosecution to challenge a statute he claims invades his constitutional rights. *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). In addition, Dr. Heisse has claimed that the denial of a license constituted deprivations of his equal protection and due process rights. *Mini Cinema 16 Inc. of Fort Dodge v. Habab*, 326 F.Supp. 1162 (N.D.Ia.1970). The parties have sufficient adversity to satisfy the case or controversy requirement.

### Standing

Defendant, without citing authority, challenges plaintiff's standing in two respects: plaintiff is under no threat of prosecution; plaintiff is raising the rights of others who are not parties to the action.

In *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975), the Supreme Court stated that within the realm of justiciability, the standing question determines whether the plaintiff's interest in the resolution of the controversy justifies exercise of the court's powers on his behalf. It must be shown that the plaintiff has suffered either threatened or actual injury as a result of the challenged action. *Id.* at 499, 95 S.Ct. at 2205. The plaintiff must assert his own legal rights and not merely the legal rights of others.

Applying these criteria to the facts of the case, the court holds that Dr. Heisse has standing. Plaintiff's complaint is that the provisions of the Act, as interpreted by the Attorney General's Office and as enforced by the Commissioner, preclude him from obtaining a license to practice his profession and that the preclusion denies him rights secured by the Federal Constitution. Although his complaint refers to a group of persons who have been denied licenses, Dr. Heisse has not brought the suit for others' benefit. Instead, as one of the persons who was denied a license, he seeks redress on his own behalf.

Dr. Heisse's denial of a license constitutes injury in fact. In addition, there is a logical connection between the claimed injury and the constitutional challenge to the statute applied to effect that denial. Furthermore, Dr. Heisse's interest in becoming an examiner in the field of truth or deception detection is within the interest sought to be regulated by the Act, namely the regulation of those who may practice in the field. He therefore has standing to maintain the action.

### The Eleventh Amendment Bar to Suit for Money Damages Against State Officials

█ In *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) and *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Supreme Court established the parameters for the exercise of the federal court's remedial powers under § 1983 to order payment of funds from the state treasury. Those cases stand for the proposition that Section 1983 does not abrogate Eleventh Amendment immunity of the states. While a court can order prospective injunctive or declaratory relief, it is unable to provide retroactive relief involving payment of state funds from the state treasury. A federal court may, however, enjoin state officials from violating the paramount law and may require them to act in accordance with federal law even though the order may have a collateral effect on the state treasury. *Quern v. Jordan, supra*, 440 U.S. at 337, 99 S.Ct. at 1143. Thus, although a federal court order may require state funds to be expended as an essential consequence of future compliance with federal law, it may not direct compensation to be paid from state funds to compensate for past breach of legal duty.

█ In his complaint, Dr. Heisse seeks $250,000 damages for loss of income and profits he would otherwise have enjoyed had he been able to use the PSE as a licensed examiner. He has sued the named defendants only in their official capacity. The action is therefore in fact a suit against the State of Vermont. Were he to prevail, the damages he seeks would require payment of funds from the state treasury to compensate him for past wrongs. That part of Dr. Heisse's complaint which seeks money damages will be dismissed.

### The Immunity of the Officials

█ Defendants claim that a suit against the Attorney General and the Commissioner of Public Safety is barred by immunity afforded public officials acting in good faith. As authority for this proposition, the defendants cite *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). However, that controversy involved an action for money damages against officials who were sued in their individual as well as official capacities. Two years later in *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Supreme Court granted absolute immunity from civil suit damages under Section 1983 to a prosecutor initiating a prosecution and presenting the State's case. The court left open the question of immunity available to a prosecutor acting as an administrative or investigative officer, rather than performing the role of advocate. Neither *Imbler* nor *Scheuer* was concerned with the question of immunity or government officials in a suit involving injunctive or declaratory relief. There is considerable and respectable authority to the effect that government officials acting in their official capacity are not immune from 1983 actions in which declaratory and injunctive relief is sought. *Slavin v. Curry*, 574 F.2d 1256 (5th Cir. 1978), *modified* 583 F.2d 779 (1978); *Boyd v. Adam*, 513 F.2d 83 (7th Cir. 1975); *Harris v. Harvey*, 419 F.Supp. 30 (E.D.Wis.1976). The court holds that action may be pursued against state officials for declaratory and injunctive relief.

### Abstention

█ Defendants urge that the abstention doctrine precludes the court from considering the constitutionality of the Act. Defendants base their argument on *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and *Huffman v. Pursue*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482

(1975). *Younger* stands for the proposition that federal courts should ordinarily abstain from enjoining ongoing state criminal prosecutions. In *Huffman*, the Court applied *Younger* principles to a pending state civil proceeding which was similar to a criminal proceeding and in which the federal plaintiff had not exhausted his state appellate remedies before seeking relief in federal court. Defendants claim that under *Huffman*, plaintiff must either first file suit in state court or exhaust his administrative remedies before seeking relief in federal court. *Younger* and *Huffman* are inapplicable here. No state action, whether civil or criminal, is pending. Furthermore, in *Steffel v. Thompson, supra*, 415 U.S. 452, 94 S.Ct. 1209, the Supreme Court held that a federal court could provide proper declaratory relief against state criminal statutes when a prosecution was not pending.

### Suit for Legislative Amendment

Defendants' final claim is that plaintiff's suit is in reality a petition for legislation amendment. Defendants' claim might have merit if Dr. Heisse had done no more than petition the court to require PSE examiners to be licensed under the Act. But this is not the case. Plaintiff alleges that the licensing statute itself is constitutionally defective. For the reasons stated, the court holds that it has jurisdiction to consider the merits of the plaintiff's claim.

### Plaintiff's Claim

The first count of Dr. Heisse's complaint charges that the Act violates equal protection rights guaranteed by the Fourteenth Amendment of the United States Constitution. Specifically, the plaintiff alleges that the Act arbitrarily discriminates against practitioners of the truth and deception profession who prefer to use the PSE or another device, rather than the polygraph. Licenses under the Act are issued only to polygraph operators and the minimum instrumentation requirements set out in Section 2902 apply only to the polygraph machine.

The function of equal protection analysis is to measure the validity of classifications created by statute. In this case the relevant classifications are those who wish to practice the profession of truth and deception detection through the use of the polygraph and those who prefer to use only the PSE. The Act permits licenses to be issued to the former group but not to the latter.

In equal protection analysis, the threshold question is whether the state infringes on a fundamental interest or discriminates against a suspect class. If it does either, the court will subject the statutory scheme to the strict scrutiny test. If a fundamental interest is not in jeopardy or a suspect class is not involved, the court determines whether the classification is rationally related to the objectives of the regulation. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (Per Curiam).

Fundamental rights include the right to privacy, the right to vote, rights guaranteed by the First Amendment, the right to procreate and the right to interstate travel. *Id.* at Note 3 and cases cited therein. Impermissible classifications involving a suspect class are those based on alienage, race and ancestry. *Id.* at Note 4 and cases cited therein. This case does not concern a suspect class. Nor is the right to practice the profession of truth and deception detection a fundamental right. *See Younger v. Colo. State Bd. of Bar Examiners*, 482 F.Supp. 1244 (D.Colo.1980) (entry into law practice not a fundamental right). The court is thus called upon to determine only whether the statute has created an unreasonable and arbitrary classification that is wholly unrelated to the statutory objectives. *E. g. Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971); *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920).

A state has a valid interest in regulating professions, especially where, as here, the practice of the profession has serious implications for the privacy rights of those who may be subjected to it. The

testimony before the court reveals that although several studies have indicated that the PSE is a reliable device for truth and deception detection, within the scientific community there continues to be some discord as to the validity of its testing results. The polygraph, on the other hand, has wider acceptance within the scientific community and a longer history of use than does the PSE. More importantly, however, the evidence established that an individual may be subjected to a PSE examination without his knowledge or consent. In fact, some of the witnesses testified that they had, on occasion, conducted a PSE test without the subject being aware his truthfulness was being tested. With the use of the polygraph machine the subject cannot be examined unknowingly. That this may have been a concern of the legislature is indicated in Section 2908 of the Act which provides that a license may be revoked if the examiner fails to inform the subject of the nature of the exam and that his participation is voluntary. These concerns establish a rational basis for the limitation of the licensing provisions of the Act to polygraph operators.

The plaintiff further contends that the exclusion of the PSE is irrational in that the language of the Act would permit a licensed polygraph operator to use the PSE in conjunction with the polygraph and then to ignore the polygraph results and base his findings solely on the PSE test. It is true that the face of the statute does not prohibit this arrangement. Defendants have also suggested this would be permissible under the Act. The court is less certain. But even if one assumes arguendo that such a situation would be acceptable, plaintiff's argument ignores the possibility that the permissible use of the PSE in conjunction with the polygraph machine may serve the legislative purpose of protecting the privacy rights of individuals who could otherwise be tested using the PSE without their knowledge or consent. Furthermore, when neither a fundamental right nor a suspect class is involved, the state can effect its legislative scheme in increments. *See Trafelet v. Thompson*, 594 F.2d 623 (7th Cir. 1979).

The Act may represent the General Assembly's initial attempt at regulating the profession. Control of the entire spectrum of possibilities is not required. The Act will be upheld in that the classification it is based on bears a reasonable relationship to the regulation of the profession of truth and deception detection.

The second count of Dr. Heisse's complaint challenges the statute by asserting that its definition of "polygraph examiner" is unconstitutionally overbroad and vague. The definition given in 26 V.S.A. § 2901 for polygraph examiner is "any person who purports to be able to detect deception or verify the truth of statements through instrumentation or the use of a mechanical device." According to plaintiff, the Act applies to any person who interrogates another for the purpose of determining whether or not he is telling the truth and who uses the aid of any instrumentality whatever, including a telephone, tape recorder, hearing aid, or other simplistic devices. The plaintiff claims that there is no way for a person of ordinary intelligence to determine if his acts are forbidden.

The Supreme Court has established that when statutes not involving First Amendment freedoms are challenged for vagueness, the challenge must be examined in light of the facts of the case at hand. *United States v. Powell*, 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975). While it is true that the term "mechanical device" is a general one, it is not necessarily vague in the context of the statute's application to the complainant. The statute defines an examiner as one who "purports to be able to detect deception ..." through the use of a mechanical device. The word "purports" implies that the individual is holding himself out as a truth or deception examiner in addition to using a mechanical device to conduct his examinations. Applied to the facts at hand, the statute appears to give adequate warning to Dr. Heisse that if he holds himself out as a truth or detection examiner and he uses the PSE in the conduct of the examinations, he will fall within the Act's definition of Polygraph Examiner.

Plaintiff also challenges the statute for overbreadth. His argument is essentially the same as that raised in the vagueness challenge. In urging invalidity of the statute for being overbroad, the plaintiff relies on *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). *Doran*, unlike the present controversy, involved a statute which threatened freedoms protected by the First Amendment. When sensitive rights are in issue, a defendant may challenge a statute on the grounds of overbreadth even though the statute may be constitutional as applied to him. Protected rights are not threatened here. The single question for the court's determination is whether the statute may constitutionally be applied to Dr. Heisse under the facts of this case. In this instance, Dr. Heisse seeks to be licensed to use the PSE to practice truth or deception detection. The PSE clearly comes within the definition of mechanical device. Dr. Heisse's situation is not a marginal case, but one that falls squarely within the ambit of activities the Act is seeking to regulate.

Finally, the definitions section of the Act, when read in conjunction with the body of the Act, affords plaintiff fair warning of whether his activity is proscribed. If plaintiff purports to be able to detect truth or deception using a mechanical device which does not meet the minimum instrumentation requirements set out in Section 2902 of the Act, then he is on notice that his activities are in violation of the Act.

The third count of Dr. Heisse's complaint alleges that the Act is unconstitutional for the reason that it constitutes special legislation which creates a monopoly in favor of truth or deception detectors who use the polygraph. The crux of plaintiff's argument is that the Act requires applicants seeking to obtain a license to complete a six month internship program, but that it does not impose a requirement that licensed polygraph operators supervise the internship programs.

The Supreme Court has recognized that an act general in form may in fact apply to a single individual alone. *Ft.* *Smith Light Co. v. Paving Dist.*, 274 U.S. 387, 389, 47 S.Ct. 595, 596, 71 L.Ed. 1112 (1927). The Fourteenth Amendment does not prohibit legislation solely because it is special or limited in its application. *Id.* at 391, 47 S.Ct. at 597. Uniform application of legislation is not required so long as the discrimination has some rational basis. The fact that a state rule results in incidental individual unequality does not make the rule offensive to the Fourteenth Amendment. *See Martin v. Walton*, 368 U.S. 25, 82 S.Ct. 1, 7 L.Ed.2d 5 (1961) (Per Curiam). The requirement of an internship program is rationally related to the State's objective of limiting licenses to those who have demonstrated some skill in the regulated profession of truth detection. The rules governing the licensing and examination of Polygraph Examiners set out specific directions as to the reports the intern must submit upon completion of the training program. The State's proper concern with the quality of training available to interns also provides a rational basis for the provision that only polygraph operators may conduct internship programs. Inasmuch as the internship provisions reflect a valid state concern with the competence of those licensed under the Act, the fact that it fails to impose on licensed polygraph operators an obligation to conduct internship programs does not constitute an infirmity that would render the Act invalid.

Count IV of the complaint alleges that the State's refusal to license PSE users is an unconstitutional taking of property without due process. As this claim was neither briefed nor argued by the parties, the court will discuss it only summarily. The claim must necessarily fail in that the plaintiff has not established that he has an entitlement to practice his profession that rises to the level of a property interest protected by the Fourteenth Amendment. Such an entitlement must be derived from a reasonably identifiable source apart from the claimant's mere desire or expectancy. *See Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Colm v. Vance*, 567 F.2d 1125 (D.C.Cir.1977). In

48

this instance the plaintiff has failed to demonstrate his interest in practicing psychological stress evaluation meets the requirement of a protected interest.

The remaining count of plaintiff's complaint is that the Act makes an unconstitutional delegation of legislative power to the Commissioner of Public Safety because it does not sufficiently define or establish the criteria by which his actions are governed. From the pleadings it is unclear how plaintiff intended to treat this claim. Plaintiff has invoked federal jurisdiction to adjudicate his claims. No substantial federal question is presented by the contention that a state statute unconstitutionally delegates power to a state agency. *Ohio ex rel. Bryant v. Akron Park District*, 281 U.S. 74, 79, 50 S.Ct. 228, 230, 74 L.Ed. 710 (1930); *Mann v. Powell*, 333 F.Supp. 1261, 1266 (N.D.Ill.1969).

Thus the court is constrained to consider the claim to be a state claim over which it has pendent jurisdiction. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The substance of plaintiff's complaint is that the Act and its accompanying rules do not specify the criteria to be used to judge an applicant's qualifications. It has been established that there is a distinction between a delegation of power to make law and the conferring of authority for the execution of the law. The former is impermissible. The latter can be done if certain guidelines apply. A law authorizing the issuing or withholding of licenses must be such that administrative decisions are guided by rules or standards which apply evenly to those the law affects. The administrative function may not be effected arbitrarily. *Village of Waterbury v. Melendy*, 109 Vt. 441, 199 A. 236 (1938); *Village of St. Johnsbury v. Aron*, 103 Vt. 22, 151 A. 650 (1930). In the *St. Johnsbury* case the court recognized its duty to make every presumption in favor of the constitutionality of an ordinance of this type and recognized its obligation to give the ordinance, if possible, a construction of validity. In *St. Johnsbury* a licensing ordinance was held to

be invalid because it did "not specify any rules or regulations upon compliance with which the right to . . . (engage in the specified business) can be exercised." *Id.* at 25, 151 A. 650.

The statute before the court at this time is not invalid for an unconstitutional delegation of authority. Although it vests in the Commissioner some discretionary authority in the exercise of his function, it does not leave him with a blank charter which he may map as he wishes. In order to be licensed under Section 2904 an applicant must demonstrate he is of good moral character, that he has not been convicted of a crime involving moral turpitude, that he has graduated from a polygraph examiner's course approved by the Commissioner and has satisfactorily completed six months of internship training or other training prescribed by the Commissioner. The Rules promulgated require an intern to submit for review five of his first fifteen polygraph examinations. In addition, Section 2908 lists twelve specific reasons for which the Commissioner may refuse to issue or may revoke or suspend a license. The Act, therefore is valid and will survive plaintiff's charge that it is an unconstitutional delegation of state legislative power.

In summary, it is not open to dispute that the function of searching for the detection of truth or deception by physiological and psychological testing is an endeavor that deeply affects the public interest, particularly as it relates to individual rights or privacy. The opportunities for distortion and abuse in this area are manifold.

The business is rather akin to that of other detection pursuits. *See Norwood v. Ward*, 46 F.2d 312, 313 (2d Cir.) (Swan, J.) affd 283 U.S. 800, 51 S.Ct. 494, 75 L.Ed. 1422 (1930). In this posture the activity is well within the reach of the police power of the General Assembly of Vermont. And it is within the legitimate province of the state legislature to adopt appropriate means to assure the integrity and competency of those administering the test. *Id.* This includes the authority to exclude test-

ing methods and procedures that do not make manifest the fact that a truth detection test was being performed and to guard against surreptitious testing. Clearly such is the design and purpose of the polygraph requirement. In the statutory means and method adopted by the lawmakers to achieve this valid legislative objective the court perceives no offense to rights protected by either the Due Process and Equal Protection Clauses. The court recognizes there is some authority to the contrary. *See e. g., Illinois Polygraph Society v. Pellicano*, 78 Ill.App.3d 340, 33 Ill.Dec. 630, 396 N.E.2d 1354 (1979). The case cited concerned a municipal ordinance which was held to be invalid under provisions of the Illinois Constitution. It is not persuasive on the challenge to the Vermont statute presented here.

The court holds that the Act is not unconstitutional. Plaintiff's motion for injunctive relief must therefore be denied. The Clerk is directed to enter an order dismissing the action. It is so ORDERED.

## SUPPLEMENTARY MEMORANDUM OF DECISION

Following the court's decision and entry of judgment on December 31, 1980, the plaintiff moved under Fed.R.Civ.P. 52(b) to amend the findings of fact stated therein to include additional facts previously proposed by the movant. The first aspect of the motion is directed to the court's failure to find plaintiff's request numbered 32.

There is no machine made by man, including the polygraph and the PSE, which can satisfy the criteria mandated by Section 2902 of the act and simultaneously record a subject's cardiovascular and respiratory patterns.

The evidence presented at the bench trial is undisputed that proper use of the polygraph records the subject's cardiovascular and respiratory reactions. There was also evidence presented that the instrumentation used in polygraph testing is not sufficiently sophisticated to record the entirety of all changes in the cardiovascular and respiratory functions. The statute makes no such demand; the Act imposes only minimum requirements. *Cf., Illinois Polygraph Society v. Pellicano*, 83 Ill.2d 130, at 135–136, 414 N.E.2d 458, 46 Ill.Dec. 574 (1980) *rev'g Illinois Polygraphic Society v. Pellicano*, 78 Ill.App.3d 340, 396 N.E.2d 1354, 33 Ill.Dec. 630 (1979), (decided on state constitutional grounds).

The fact that the polygraph does not record ballistocardiographic patterns, changes in arterial pressures, nor every aspect of respiratory patterns, does not proscribe its use under the statute. The court recognizes that the use of voice modulation recorded in electronic recording can supplement usual polygraph procedures. When so used by a licensed polygraph operator the statute is not offended. The requested amendment is denied.

The second area of the plaintiff's concern relates to the court's statement:

Numerous studies have analyzed the reliability of the PSE as a device for detecting truth and deception. Although several studies have concluded that the PSE is a reliable, workable instrument, there is disagreement in the scientific community about the *validity* of PSE testing. (emphasis added)

It was the sense of a portion of Dr. Heisse's testimony on cross-examination that the scientific community had not fully accepted the PSE as a superior method for detecting truth and deception. The plaintiff conceded there were conflicting views. It appears that the plaintiff's challenge to this aspect of the court's decision is semantically based.

In this connection the plaintiff seeks to have the court include, in considerable detail, the nature and results of various studies conducted to compare the utility and effectiveness of the PSE with the polygraph. The court concludes these are matters more properly addressed to the Vermont General Assembly to effect a statutory modification, rather than to the court in determining the constitutionality of the present enactment.

The final aspect of the plaintiff's motion is the court's concern about the possible surreptitious use of PSE without the subject's knowledge. The motion refers to Dr. Heisse's testimony to the effect that the use of PSE without the subject's permission is an unlikely prospect. However, the plaintiff testified that he has used the PSE covertly at least once. He had also used the instrument in connection with radio transcriptions of historical events to evaluate the truth of various witnesses before Congressional and other hearings. These tests and evaluations were done by the plaintiff without the knowledge or consent of the subject. Although the prospect of such use may be unlikely, it was a legitimate legislative function to withhold approval of such testing from the cover and imprimatur of a license.

For the reasons stated herein, the plaintiff's motion to amend the facts found in the court's decision filed December 31, 1980 is denied. It is so ORDERED.